UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
ESTEBAN PEREZ, FELIPE GALINDO, and DELFINO LOPEZ,
                              Plaintiffs,
        -against-
                    Case No. 1:17-cv-07837 (R15)

50 FOOD CORP. (D/B/A SILO CAFE) and ANDREW SUNG
(A.K.A. HWAN SEUNG SUNG),
                              Defendants.

------------------------------------------------X
                Bee Reporting Depo Center
                89-00 Sutphin Boulevard
                Jamaica, New York 11435
                May 22, 2018
                10:30 A.M.

                DEPOSITION of MINCHUL
        KIM, the 30(b)(6) Witness on behalf of the
        Defendant herein, 50 FOOD CORP. (D/B/A SILO
        CAFE), taken by the attorney for the Plaintiff,
        through a Korean Interpreter, pursuant to
        Notice, and held before Kathleen Anderson, a
        Notary Public of the State of New York, at the
        above stated time and place.

                                                    1

1
2      A P P E A R A N C E S :
3
4      CATHOLIC MIGRATION SERVICES
           Attorneys for Plaintiff(s)
           47-01 Queens Boulevard, Suite 201
5          Sunnyside New York 11104
6      BY:  MAGDALENA BARBOSA, ESQ.
7
8
9
10     VARACALLI & HAMRA, LLP
           Attorney for Defendant(s)
11         32 Broadway, Suite 1818
           New York New York 10004
12
       BY:  DOUGLAS VARACALLI, ESQ.
13
14
15
16
       ALSO PRESENT:
17
           GIRA HONG, Korean Interpreter
18
19
20
21
22
23
24
25
                                                    2

1                      M. KIM
2       GIRA HONG,
3           The Interpreter herein, having been duly
4       sworn by Kathleen Anderson, a Notary Public in
5       and for the State of New York, to interpret the
6       questions from English into Korean, and the
7       answers from Korean into English, interpreted
8       as follows:
9       MINCHUL KIM,
10          The witness herein, having been first
11      duly sworn by Kathleen Anderson, a Notary
12      Public in and for the State of New York, was
13      examined, and testified as follows:
14      DIRECT EXAMINATION
15      BY MAGDALENA BARBOSA, ESQ.:
16          Q    What is your name?
17          A    Minchul Kim.
18          Q    What is your address?
19          A    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ floor,
20          ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓54.
21          Q    Good morning, Mr. Kim.  My name is
22      Magdalena Barbosa.  I'm the attorney for
23      Esteban Perez, Felipe Galindo and Delfino
24      Lopez.  They have filed a lawsuit in federal
25      court against 50 Food Corp., also known as Silo
                                                    4

IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective
parties hereto, that the sealing, filing and
certification of the transcript of the within
examination before trial will be and the same
hereby are waived.

        IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, will be reserved to the time of
trial;

        IT IS FURTHER STIPULATED AND AGREED that
the within examination may be signed before any
Notary Public with the same force and effect as
if signed and sworn to before this Court.

                                                    3

M. KIM

1
2  Café and Andrew Sung.  You have been noticed to
3  sit for a deposition today for two reasons.
4  Number 1, you will be giving testimony as a
5  representative of 50 Food Corp. And then later
6  in the day, once we are done with the questions
7  for 50 Food Corp., you will be responding to
8  questions in your individual capacity.  Do you
9  understand that?
10      A   Yes.
11      Q   So this accident is being recorded by
12  a court reporter.  Her job is to record my
13  questions and your answers.  She can only
14  record verbal responses, so just be mindful not
15  to nod your head in response.  Please provide a
16  verbal response; do you understand that?
17      A   Yes.
18      Q   Have you ever been deposed before?
19      A   No.
20      Q   Have you ever testified in a court
21  proceeding before?
22      A   I have not.
23      Q   Have you ever participated in a
24  lawsuit before as a defendant or a plaintiff?
25      A   Never.

5

M. KIM

1
2  besides Minchul Kim?
3      A   Yeah.  At store I'm known as Dennis.
4      Q   What is your date of birth?
5      A   XX/XX/1975.
6      Q   Where were you born?
7      A   From South Korea.
8      Q   When did you move to the United
9  States?
10      A   2001.
11      Q   Have you lived in the United States
12  since 2001?
13      A   Yes.
14      Q   Here in New York City?
15      A   Queens.
16      Q   What is your educational background?
17      A   I graduated from college in Korea,
18  and here in the U.S. I went to community
19  college.
20      Q   Did you major in any particular field
21  of study?
22      A   Food service and management.
23      Q   Did you receive a degree?
24      A   I received a diploma from community
25  college.

7

M. KIM

1
2      Q   Let me just go back to a few more
3  basic instructions for today.  I just want to
4  make sure that you know if you don't understand
5  any of my questions, you should ask for
6  clarification from me; do you understand?
7      A   Thank you.
8      Q   Do you understand that you are under
9  oath and you must respond to my questions
10  truthfully?
11      A   Yes.
12      Q   Is there anything that might prevent
13  you from testifying truthfully today?
14      A   None.
15      Q   For example, are you under any type
16  of medication that might impact your ability to
17  testify truthfully today?
18      A   None.
19      Q   Will you please let me know if you
20  need to take a break at any point today?
21      A   I will.
22      Q   And do you have any questions before
23  I continue?
24      A   No, I don't.
25      Q   Have you ever gone by any other names

6

M. KIM

1
2      Q   What community college did you
3  attend?
4      A   LaGuardia.
5      Q   Have you ever been arrested either
6  here in the United States or elsewhere?
7      A   None whatsoever.
8          THE INTERPRETER:  I just asked him
9      to speak a bit more loudly.
10         MS. BARBOSA:  Okay.
11      Q   Can you tell me what you did to
12  prepare for today's deposition?
13      A   None.
14      Q   Did you speak with Mr. Sung, Mr.
15  Andrew Sung regarding this deposition?
16      A   No.
17      Q   Does he know that you're here this
18  morning being deposed in this matter?
19      A   Yes.
20      Q   Did he ask you to appear on behalf of
21  50 Food Corp.?
22      A   I'm a bit confused what you are
23  asking.
24      Q   Did you say that Mr. Sung knows
25  you're being deposed here; correct?

8

M. KIM

1
2      A   Yes.
3      Q   How does he know?
4      A   Yeah, well, I received some summons
5   to be here and I presented it to Mr. Sung and
6   that's how he knows that I need to be here
7   today.
8      Q   When you presented the notice to Mr.
9   Sung, what did you discuss regarding the
10  deposition with him?
11     A   Oh, he just said that you will just
12  be a witness, provide honest answers.
13     Q   Did he say anything else?
14     A   No.
15     Q   Did he give you any tips or
16  recommendations about how to, I guess, perform
17  at today's deposition?
18     A   None.
19     Q   Did he show you any documents to
20  prepare for today's deposition?
21     A   None.
22     Q   So the only thing that he said to you
23  regarding this deposition is that you will be a
24  witness and that you just need to answer
25  truthfully?

9

M. KIM

1
2      A   And he said nothing else?
3      Q   Did he say nothing else?
4      A   No.
5      Q   When did you first begin working for
6   50 Food Corp.?
7      A   2008.
8      Q   When in 2008?
9      A   I think maybe in October.
10     Q   How was it that you ended up working
11  for 50 Food Corp.?
12     A   I was introduced to that job from
13  acquaintance.
14     Q   Who was the acquaintance?
15     A   A friend I know from church.
16     Q   What's this friend's name?  Do you
17  recall this friend's name, Mr. Kim?
18     A   His first name is K A N G, M Y O, his
19  last name is N A H.
20     Q   What is your understanding of how Mr.
21  Nah knew about 50 Food Corp.?
22     A   The boss is also a member of the
23  church congregation.
24     Q   So Mr. Sung is a member of the same
25  church as Mr. Nah?

10

M. KIM

1
2      A   Yes, and me.
3      Q   What's the name of the church?
4      A   Promise Church.  Promise Church.
5      Q   Is that located here in New York
6   City?
7      A   Promise Church is in Flushing.
8      Q   When did you first hear about the
9   job?
10     A   I really can't remember when, but I
11  think approximately in -- somewhere in the year
12  2008 and I remember that because I had just
13  gotten married and that's how I recall that
14  incident.
15     Q   Okay.  What did Mr. Nah tell you
16  about 50 Food Corp.?
17     A   And that the owner, Mr. Sung, was
18  looking for someone to hire.
19     Q   And shortly after that, did you meet
20  with Mr. Sung to speak with him about the
21  position?
22     A   Yes.
23     Q   And what kind of job was Mr. Sung
24  looking to fill?
25     A   Manager.

11

M. KIM

1
2      Q   Was it Mr. Sung who hired you?
3      A   Yes, he did, through Mr. Nah's
4   introduction.
5      Q   But you did meet eventually with Mr.
6   Sung in person; is that right?
7      A   Yes.
8      Q   Did Mr. Sung ask you about your
9   experience in managing a deli?
10     A   Yes.
11     Q   Would it be correct to characterize
12  50 Food Corp., is a deli or should I call it a
13  café?
14     A   It's -- yeah, a deli style.
15     Q   Prior to starting at 50 Food Corp.,
16  what were you doing for work?
17     A   I worked at a deli.
18     Q   What was your position at that deli?
19     A   I used to make sandwiches.
20     Q   Did your job include any management
21  of the business?
22     A   Okay, then I wasn't actually involved
23  in management, but as I said before, I studied
24  it, food management, and so I was aware about
25  how to perform management tasks.

12

3  (Pages 9 to 12)

M. KIM

```
 1                    M. KIM
 2        Q   So you were hired by Mr. Sung to be
 3   the manager at 50 Food Corp.; is that right?
 4        A   Yes.
 5        Q   That was your title when you started?
 6        A   Yes.
 7        Q   What do you know of the previous
 8   manager of 50 Food Corp., before you began?
 9        A   I don't know.
10        Q   Was there a manager before you
11   started?
12        A   I believe there was one manager
13   working there prior to me.  Prior to myself.
14        Q   Do you know that manager's name?
15        A   I don't.
16        Q   Do you know what happened to that
17   manager?
18        A   I do not know.
19        Q   When you first began working at 50
20   Food Corp., do you recall what your
21   compensation was?
22        A   It's hard to recall exactly how much
23   that was.
24        Q   Can you estimate?
25        A   800.
                                              13
```

```
 1                    M. KIM
 2        Q   $800 per week?
 3        A   Yes.
 4        Q   Did Mr. Sung pay you?
 5        A   Yes.
 6        Q   Were you paid in cash or by check?
 7        A   I believe it was paid half in cash
 8   and half in check.
 9        Q   I assume your compensation has
10   changed over the years; is that correct?
11        A   That is correct.
12        Q   Could you tell me what your
13   compensation is now?
14        A   1,150.
15        Q   Again, are you paid in cash or by
16   check?
17        A   Again, half and half.
18        Q   In the part that you receive in
19   check, are withholdings made?
20        A   Yes, it's taken out, the tax is taken
21   out from there, the check portion.
22        Q   Okay.  Have you ever owned any
23   businesses?
24        A   No.
25        Q   You indicated earlier that before
                                              14
```

```
 1                    M. KIM
 2   beginning at 50 Food Corp., you worked at a
 3   deli making sandwiches, but you also had some
 4   management responsibilities; is that correct?
 5        A   That is not entirely correct.
 6        Q   Can you tell me what was incorrect
 7   about that?
 8        A   What I had said about that job, what
 9   I meant to say is that because I studied food
10   and management I knew it, I knew how to manage
11   that subject.
12        Q   Oh, okay, that's fine.  I apologize
13   for misunderstanding.
14            So at the deli you had no management
15   responsibilities, you just made sandwiches; is
16   that correct?
17        A   Yes, and what I do want to elaborate
18   that I did help out as assistant manager
19   occasionally, but I was not responsible
20   entirely to manage anything.
21        Q   What were your tasks when you helped
22   out as an assistant manager?
23        A   Yeah, things along the line of making
24   orders, placing orders.
25        Q   Did you have any responsibilities for
                                              15
```

```
 1                    M. KIM
 2   any of the employees?
 3        A   None.
 4        Q   Why did you leave?
 5        A   Do I need to explain the reason?
 6        Q   Just briefly, please.
 7        A   Normally, the delis, one works about
 8   six days only, but that deli was able to work
 9   only five days a week and I liked that because
10   I had just gotten married.  That's the reason.
11        Q   I'm sorry, so what was the reason,
12   the reason was because you wanted to work more
13   or less?
14        A   Because I'm saying that because I had
15   gotten married, I needed to have more time with
16   my wife.
17        Q   Got it.  Okay, thank you.  Could you
18   tell me what the name of this deli was?
19        A   Hanover, H A N O V E R.  I'm not
20   certain about how to spell that name.
21        Q   Where was Hanover deli located?
22        A   Lower Manhattan.
23        Q   Do you recall where in lower
24   Manhattan?
25        A   It was close to Wall Street.
                                              16
```

4  (Pages 13 to 16)

M. KIM

```
 1                M. KIM
 2       Q   When you met with Mr. Sung regarding
 3   the job at 50 Food Corp., what did he tell you
 4   about your principal responsibilities as the
 5   manager of the deli?
 6       A   He said it was very important to
 7   oversee the employees.  He also said that since
 8   this is my first time working as a manager, he
 9   said to just take it one at a time, as if he's
10   learning something new every day.  And that he
11   was going to train me.
12       Q   Did he break down exactly what you
13   would be in charge of at the deli?
14       A   Yes, he did.
15       Q   You mentioned just a few seconds ago
16   that Mr. Sung said that he would train you; is
17   that right?
18       A   Yes.
19       Q   Was it your understanding that Mr.
20   Sung had a lot of experience managing that
21   deli?
22       A   I thought so.
23       Q   How long did Mr. Sung train you for?
24       A   It was so long ago, so I'm not so
25   certain, but I think that about two months
```
17

```
 1                M. KIM
 2   Sung?
 3       A   Yes, he did.
 4       Q   What did Mr. Sung show you or train
 5   you about the payroll?
 6       A   He informed me about employees'
 7   hourly pay, and that there's a 1.5 hours pay
 8   for overtime.  I believe that was the most
 9   important thing he taught me.  And that I need
10   to get a signature from the employees upon
11   handing over the wages.
12       Q   Okay.  Were the wages of the
13   employees already set when you started?
14       A   Yes.
15       Q   Was it your understanding that Mr.
16   Sung had already set these hourly wage rates
17   for the employees at the café?
18       A   Yes.
19       Q   You indicated that Mr. Sung advised
20   you to have the employees sign; is that
21   correct?
22       A   Yes, because we had paid them and we
23   needed the signature.
24       Q   So the signature would be proof that
25   you paid them; is that correct?
```
19

```
 1                M. KIM
 2   would be a good estimate.
 3       Q   Was Mr. Sung present with you at the
 4   deli each day during those two months?
 5       A   I believe he was always at the store
 6   when I was working there.
 7       Q   He was always at the store when you
 8   were working there?
 9       A   I think that for about a year or so
10   he was always there when I was working.
11       Q   During that time, for the first year
12   while you were the manager at 50 Food Corp.,
13   what did Mr. Sung do?
14       A   Well, I just want to start by saying
15   that during that time, the business was
16   extremely slow and so I really can't recall
17   precisely what Mr. -- what I saw Mr. Sung do,
18   but I remained -- I didn't want to remain in
19   office so much, but rather go out to the floor
20   and organize displays, things like that.
21       Q   When you first started at 50 Food
22   Corp., did Mr. Kim show you how to run the
23   payroll?
24       A   Yes.
25       Q   Mr. Sung, I apologize.  I meant Mr.
```
18

```
 1                M. KIM
 2       A   Yes.
 3       Q   Did he already have a document that
 4   -- did Mr. Sung already have a document that he
 5   had created where employees would sign for
 6   their pay?
 7       A   In my recollection, yes.
 8       Q   Did Mr. Sung instruct you to use the
 9   same form?
10       A   I -- my answer is yes, because I had
11   to make copies of those forms.
12       MS. BARBOSA:  So I'm going to mark
13   this as Plaintiff's 1.
14       (Whereupon, the Notice of Deposition
15   was marked as Plaintiff's Exhibit 1 for
16   Identification, this date by the
17   Reporter.)
18       Q   Mr. Kim, have you seen this document
19   before, the document marked as Plaintiff's
20   Exhibit 1?
21       (Witness peruses document.)
22       A   I never have.
23       Q   I am going to ask you to turn to the
24   -- you've never seen this document before?
25       A   Never.
```
20

M. KIM

1
2      Q    You indicated earlier that when you
3   received the notice about this deposition that
4   you showed it to Mr. Sung; is that right?
5      A    What I meant to say is that upon
6   receiving the notice for me to appear for
7   deposition, I needed to show it to Mr. Sung so
8   that I can get a day off for that.  That was
9   the reason why I showed him.
10     Q    Oh, okay.  At any time did Mr. Sung
11  tell you that you would also be giving
12  testimony as a representative of 50 Food
13  Corp.?
14     A    No.
15     Q    Is this the first time that you're
16  hearing that you're being deposed as a
17  representative of 50 Food Corp.?
18     A    Upon receiving the notice, in fact
19  while I was at work, somebody hand delivered a
20  notice for me to appear at the deposition.
21     Q    When you received that notice, you
22  understood that you would be sitting for a
23  deposition as a representative of the
24  corporation?
25     A    Not quite to that extent.

21

M. KIM

1
2      Q    Is this the first time now, with me
3   telling you, that I understand that you are
4   giving testimony as a representative of the
5   corporation, 50 Food Corp.?
6          THE INTERPRETER:  He wants me to --
7   he wants to have the question repeated.
8      Q    I mentioned at the beginning of this
9   deposition that you are here today for two
10  purposes.  Number 1, I have been told that you
11  would be providing testimony today as the
12  representative for 50 Food Corp. Number 2, you
13  are being deposed in your personal capacity in
14  response to the subpoena you were served with
15  at Silo Café several weeks ago?
16     A    Okay.  I do recall what you had said
17  about those two reasons for my coming here and
18  I said -- I answered yes to both, but in
19  reality, I thought I was coming here to testify
20  as -- on a personal level to just testify the
21  truth about what I know.  So I didn't feel the
22  need to review anything to prepare for this
23  deposition.
24     Q    Okay.  Just to confirm, this morning
25  is the first time you heard that you would be

22

M. KIM

1
2   deposed as a representative of 50 Food Corp.;
3   is that right?
4      A    I just want to say again that I
5   thought I was here for the second reason you
6   had mentioned.
7      Q    Okay.  I understand that.  So then
8   this is the first time that you're hearing that
9   you are also a representative for 50 Food
10  Corp.?  It's a yes or no question.
11     A    Yes.  First time, yes.
12     Q    So I want to have you take a look at
13  the first page of the document in front of you,
14  so in the caption of that document it says,
15  Notice of Deposition Pursuant to FRCP 30(b)(6);
16  do you see that?
17     A    Yes.
18     Q    The last two lines on the first page
19  of the notice say, 50 Food Corp is requested to
20  designate the person or persons most
21  knowledgeable and prepared to testify on behalf
22  of 50 Food Corp regarding the following topics.
23  Okay, turn the page please.  Defendant's
24  employment practices including, if you want to
25  read on, I'm just reading the second page.

23

M. KIM

1
2   Number 1, existing policies and practices for
3   compliance with federal, state and local labor
4   laws and regulations including, but not limited
5   to, minimum wage and overtime laws and spread
6   of hours law at 50 Food Corp. Just number 1,
7   can you read that to him, please?
8          THE INTERPRETER:  I will do that.
9   One thing I may ask, so you're saying
10  these will be the relevant things that
11  he's expected to --
12         MS. BARBOSA:  That's correct.
13         THE INTERPRETER:  Now it makes more
14  sense to me, okay.
15         Yes, ma'am.
16     Q    Do you have knowledge of this topic?
17     A    Yeah.  I feel that I just have
18  basics, a basic knowledge about this matter.  I
19  knew that it would be forty hours for full-time
20  and the rate for overtime.
21     Q    Number 2, do you have knowledge of
22  the maintenance of records of employees' work
23  hours, wages and other compensation at 50 Food
24  Corp.?
25     A    I was really focusing on the papers

24

6  (Pages 21 to 24)

M. KIM

1
2   where we had obtained signature in exchange for
3   paying wages to the employees.
4       Q   So the question is really a yes or no
5   question.
6       A   Yes.
7       Q   Do you have knowledge of looking at
8   number 3, the maintenance of employees'
9   personnel files at 50 Food Corp.?
10      A   No.
11      Q   Do you have knowledge of number 4,
12  employment practices including but not limited
13  to recruitment, hiring, selection practice,
14  transfer or promotion policy benefit provisions
15  and grievance process?
16      A   Yes.
17      Q   Number 5, do you have knowledge of
18  documents issued to and/or signed by employees
19  at 50 Food Corp., including but not limited to
20  personnel manuals, records of hours worked,
21  evaluations, write-ups, warnings and
22  disciplinary notices?
23      A   I remember just giving them verbal
24  warnings when needed.
25      Q   So then you are knowledgeable of this

25

M. KIM

1
2   schedules at 50 Food Corp.?
3       A   Yes.
4       Q   I will ask you to turn the page.  Do
5   you have knowledge of the corporate policy and
6   procedures for creating, adjusting and
7   maintaining record-keeping of wage and
8   compensation records and practices relevant
9   this litigation?
10      A   I was managing those things.
11      Q   So I understand that you did not look
12  at any documents to prepare for this
13  deposition; is that correct?
14      A   I said I had no preparation because I
15  felt no need to prepare myself before coming
16  here because I thought I would be required to
17  testify just whatever I know.
18      Q   And you feel competent testifying in
19  the areas that I just listed a few moments ago;
20  is that right?
21      A   They're fine.
22          MS. BARBOSA:  Very good.  Will you
23  mark this as Plaintiff's Exhibit 2?
24          (Whereupon, the Plaintiff's First
25  Request For Production of Documents and

27

M. KIM

1
2   particular category of information?
3       A   Yes.
4       Q   Are you knowledgeable of the methods
5   used to calculate compensation of employees at
6   50 Food Corp.?
7       A   Yes.
8       Q   Are you knowledge of the methods used
9   to record employees' work hours including any
10  written or computer methods at 50 Food Corp.?
11      A   Yes.
12      Q   Are you knowledgeable of the methods
13  used to collect deductions of employees'
14  compensation and/or fines and penalties at 50
15  Food Corp.?
16      A   Are you referring to in cases of
17  employees being late to work?
18      Q   That could be one reason.
19      A   In that case I answer yes.
20      Q   So you have knowledge of deductions
21  made to employees' wages for number one,
22  lateness, perhaps?
23      A   Yes.
24      Q   You have knowledge of employees' work
25  schedule and any changes to their work

26

M. KIM

1
2   Interrogatories was marked as Plaintiff's
3   Exhibit 2 for identification, this date
4   by the Reporter.)
5       Q   Have you seen this document before?
6   (Witness peruses document.)
7       A   I believe I had seen this before.
8       Q   For the record, Plaintiff's Exhibit
9   number 2 is Plaintiff's First Request for
10  Production of Documents and Interrogatories.
11          When do you think you saw this
12  document before?
13      A   I do recall seeing this when it came
14  in the mail and the owner, Mr. Sung, was not
15  there, so I opened the mail.
16      Q   What did you do with it after you saw
17  it?
18      A   I called the boss, Mr. Sung.
19      Q   What did he tell you to do?
20      A   He replied that he was going to take
21  — he was going to take care of it and that I
22  should not be worried about it.
23      Q   Did you read through this document?
24      A   I just peruses through it and was
25  aware of what this document was about.

28

7 (Pages 25 to 28)

M. KIM

1
2    Q    What was your understanding of what
3    this document was about?
4    A    I thought that this was relating to
5    some overtime issues, overtime payment issues.
6    Q    Did you review this, what you thought
7    was this document again after you received it
8    in the mail or was that the only time that you
9    reviewed it?
10   A    When I called Mr. Sung, he told me
11   that he would be taking care of it, so I was
12   not concerned about this document, so when I
13   got it, got similar to it in the mail again, I
14   did not even bother to look at them.
15   Q    Did Mr. Sung ask you for your
16   assistance in helping to collect the
17   information to respond to Plaintiff's request?
18   A    I say yes, because as I mentioned, I
19   had signatures from the employees when they
20   were paid and I just got those things for the
21   owner, Mr. Sung.
22   Q    So the documents that you collected
23   were the documents that the employees had
24   signed; is that right?
25   A    Yes, because Mr. Sung said he needs

29

M. KIM

1    found for him two categories of documents,
2    number 1, the notice for newly hired employees,
3    and number 2, the document that employees
4    signed?
5    A    So those were the two things that Mr.
6    Sung asked me for, which I provided, and later
7    time he asked me to look further for any
8    additional information or evidence on any
9    employees and I looked for them.
10   Q    Did you find anything?
11   A    Records of paid sick days.
12   Q    Anything else?
13   A    He also asked for file, computer file
14   which I had been preparing for him, it has
15   records of the weekly expenditures.
16   Q    Could you describe to me the document
17   a little bit more regarding the weekly
18   expenditures, what is that document?
19   A    Again, that form was set up even
20   prior to my joining the store.
21   Q    Who set it up?
22   A    That I do not know. But it's very
23   likely the boss, Mr. Sung.
24   Q    Can you describe what that document

31

M. KIM

1    is?
2    A    It records work hours, hourly pay,
3    how many hours each given employee worked a day
4    and their hourly rate.
5    Q    Anything else?
6    A    No.
7    Q    Did Mr. Sung ever show you the
8    specific requests that plaintiffs made for
9    documents?
10        THE INTERPRETER:  I'm sorry.
11        MS. BARBOSA:  Would you like me to
12   rephrase it?
13        THE INTERPRETER:  Yes.
14   Q    Did Mr. Sung ever show you
15   specifically what plaintiffs were requesting
16   from 50 Food Corp., what types of documents
17   they were requesting?
18   A    No, no.
19   Q    Would you say Mr. Sung is fairly
20   knowledge of what documents 50 Food Corp has
21   regarding employees' compensation and
22   employees' hours?
23   A    In reality I think that I'm more
24   hands on in that field than he is.

32

M. KIM

1
2    it.
3    Q    Did he ask you for any other types of
4    documents?
5    A    Yes, I had it in my possession and I
6    handed that over to him.
7    Q    I guess my question was, did he ask
8    you for any other types of documents?
9    A    He did ask if I had any additional
10   documents or evidence.
11   Q    What types of documents did he ask
12   you to look for?
13   A    Initially he asked me to find the
14   form that's filled out by -- filled out when
15   employees are newly hired which contains hourly
16   rate and overtime and then some preliminary
17   information about the new employee.
18   Q    So he asked you to look for those
19   documents; right?
20   A    Yes.
21   Q    Did he ask you to look for any other
22   types of documents?
23   A    I really can't think of anything else
24   he asked for.
25   Q    Is it correct then that you only

30

M. KIM

1
2    Q   I appreciate your sharing that with
3    me, but that doesn't really respond to my
4    question. My question is, do you think Mr.
5    Sung is pretty knowledgeable of what documents
6    do exist at 50 Food Corp including, for
7    example, this document that you described
8    earlier about where employees sign, the sick
9    leave documents you described and this computer
10   file?
11       A   Yeah, I believe he has good knowledge
12   of them.
13           MS. BARBOSA: Very good. Thank you.
14   Can you mark this as Plaintiff's Exhibit
15   3.
16           (Whereupon, the Defendant's
17   Responses to Plaintiff's Request For
18   Production of Documents was marked as
19   Plaintiff's Exhibit 3 for identification,
20   this date by the Reporter.)
21       Q   Take a moment to review this
22   document.
23           (Witness peruses document.)
24       A   I never saw it before.
25       Q   Plaintiff's Exhibit number 3 is

33

M. KIM

1
2           (Witness peruses document.)
3       A   I haven't seen it before.
4       Q   This is the document of questions
5    that plaintiffs submitted to defendants 50 Food
6    Corp., and Andrew Sung. If you turn to the
7    following page, what is marked as page 2 on the
8    bottom of Answers to Interrogatories, they also
9    include the questions presented by plaintiffs.
10   I don't know if you want to?
11           THE INTERPRETER: Yeah. Yes.
12       Q   So some of the questions involve the
13   names and addresses of people who might have
14   information related to this lawsuit.
15           At any time did Mr. Sung or anyone
16   else ask you for information responsive to this
17   request?
18       A   To myself, you mean? To myself did
19   he ask?
20       Q   Yes, did he ask you?
21       A   Are you asking me if these people
22   listed below me are also aware of the
23   plaintiff's request?
24       Q   No. My question is, did anyone ever
25   call you or speak to you about providing

35

M. KIM

1
2    Defendant's Responses to Plaintiff's Request
3    For Production of Documents. If you turn to
4    the fourth page, please?
5           THE INTERPRETER: The one that says
6    4?
7           MS. BARBOSA: It's actually the next
8    one that says number 1, sorry.
9           THE INTERPRETER: That's okay.
10   Number 1 or number 2?
11           MS. BARBOSA: Number 1. Just this
12   is page 1, 2, 3, 4.
13           THE INTERPRETER: This is numbered
14   very incorrectly.
15           MS. BARBOSA: Sorry, it's double
16   sided.
17           So we should all be looking at the
18   document, the page with a caption,
19   Defendant's Amended Response to
20   Plaintiff's First Set of Interrogatories.
21           THE INTERPRETER: Yes. Which is
22   also page 1, thank you.
23           MS. BARBOSA: That's correct.
24       Q   Have you ever seen this document
25   before?

34

M. KIM

1
2    information responsive to this request? The
3    request being who are people who might have
4    information related to this lawsuit?
5           THE INTERPRETER: Can you just to
6    clarify, what is your ultimate question
7    again?
8           MS. BARBOSA: Is that what he asked?
9           THE INTERPRETER: He said yes. I
10   have to explain to him the nature of this
11   list pursuant to the Plaintiff's request.
12   So what is your bottom -- the question
13   which you said before?
14       Q   So my question is, did anyone --
15   forget about this, just listen to my question.
16   My question is, did anyone ever call you or
17   speak with you and ask you for information to
18   respond to the request, the request being what
19   people might have information about this
20   litigation?
21           THE INTERPRETER: He says he's
22   confused. I don't know why.
23       Q   Did anyone ever call you, did Mr.
24   Sung or anyone call you and say, plaintiffs
25   have made requests for information that we have

36

9 (Pages 33 to 36)

M. KIM

1  a responsibility to respond to, here are some
2  of the questions, do you know these answers?
3      A  He never did.
4      Q  Okay. Okay. Do you have any
5  knowledge of what type of corporation 50 Food
6  Corp is?
7      A  I do not know.
8      Q  Are you aware that 50 Food Corp is
9  essentially Silo Café?
10      THE INTERPRETER:  Silo Café?
11      MS. BARBOSA:  That's right.
12      A  The names are not relevant me.  I
13  just know that I'm working at Silo Café, and I
14  don't know anything other than that.
15      Q  Have you ever heard of the term 50
16  Food Corp before?
17      A  I have.  I knew that the corporation
18  name because I see mail with that name.
19      Q  Okay.  Do you have any knowledge of
20  when Silo Café at 803 Third Avenue was open?
21      A  I believe, I believe it in August
22  2008.
23      Q  Did I get the address correct, I
24  think I said 803 Third Avenue, but is it 805

37

M. KIM

1  correct, but that was my understanding.
2      Q  Are you aware of any business
3  partners to Mr. Sung who might also be
4  connected to 50 Food Corp.?
5      A  I do not know about that.
6      Q  Do you know whether the company owns
7  or rents the property located at 805 Third
8  Avenue?
9      A  I am aware that it's a rented
10  facility.
11      Q  Have you ever seen the lease before?
12      A  No.
13      Q  Do you know it's a rental property
14  because you're involved in paying the rent?
15      A  Because I was given the monthly, the
16  rent check from the owner, Mr. Sung.
17      Q  So Mr. Sung gives you the rent check
18  to give to the landlord of the property?
19      A  Yes, I would deliver that to the
20  landlord.
21      Q  You do that on a monthly basis?
22      A  Yes.
23      Q  Have you always done that since you
24  began at Silo Café?

39

M. KIM

1  Third Avenue?
2      A  805.
3      Q  So you said you believe it was opened
4  in 2008?
5      A  Yes.
6      Q  When did you say you think it was
7  opened?
8      A  August.
9      Q  I recall you saying earlier that you
10  began working at Silo Café in October of 2008;
11  is that right?
12      A  Yes.  That is correct, and as I said,
13  there was a manager prior to myself.
14      Q  So if there was a prior manager at
15  Silo Café, that person was really only working
16  for a few months before you started; is that
17  correct?
18      A  I believe so.
19      Q  Are you aware of who the corporate
20  officers might be for 50 Food Corp.?
21      A  I know nothing about that.
22      Q  Do you understand Mr. Sung to be the
23  only owner of 50 Food Corp or Silo Café?
24      A  I'm not sure that I'm entirely

38

M. KIM

1      A  Yes.
2      Q  Do you know who the landlord is?
3      A  I do not know because I would just
4  bring it to the building and hand it over to
5  the security and in turn that security would
6  bring it to the landlord.
7      Q  And the check, so Mr. Sung gives you
8  a check on a monthly basis, is that a Silo Café
9  check or a check, a personal check from Mr.
10  Sung?
11      A  In fact I saw it, it had 50 Food Corp
12  name on the check.
13      Q  Okay, thank you.  Is it correct that
14  the café is only open Monday through Friday?
15      A  Yes.
16      Q  What are the hours of the café?
17      A  Nowadays it's operating from 7:00 AM
18  to 3:30 PM.  In fact the actual business ends
19  at 3:00 PM.
20      Q  I guess my question, what I'm asking
21  right now is not employees' hours, I am asking
22  when the business is open, what are the hours
23  of the business?  What time is the café open in
24  the morning?

40

10  (Pages 37 to 40)

M. KIM

1
2      A   You're talking about business hours?
3      Q   Exactly.
4      A   7:00 AM to 3:30 PM.
5      Q   Is the café typically closed on
6   holidays?
7      A   Yes.
8      Q   Could you tell me what holidays the
9   café closes for?
10      A   Memorial Day, 4th of July, July 4,
11   Christmas, Thanksgiving, because there are no
12   customers during those holidays.
13      Q   Any other holidays besides Memorial
14   Day, 4th of July, Christmas and Thanksgiving?
15      A   New Years.  Probably a few more which
16   I can't really remember offhand.
17      Q   Who determines what days the business
18   closes?
19      A   The owner, Mr. Sung.
20      Q   Right now, how many employees does 50
21   Food Corp have?
22      A   Thirteen or fourteen, between
23   thirteen and fourteen.
24      Q   Could you identify the different jobs
25   that people currently do at 50 Food Corp.?

41

M. KIM

1
2   hired them?
3      A   I did.  Yeah, Felix and Delfino were
4   not hired by me personally because they had
5   already been there prior to my starting my
6   employment there.
7      Q   So you're referring to Delfino,
8   Plaintiff, Delfino Lopez and Plaintiff, Felix
9   Galindo?
10      A   Yes.
11      Q   Did you have to alert Mr. Sung that
12   you were hiring these employees?
13      A   My normal practice that I do inform
14   Mr. Sung about new hires, but since there is a
15   ay too frequent turnaround, I would
16   inadvertently forget to inform Mr. Sung each
17   time I have new hire.
18      Q   Let me make sure I understand.
19   Typically it's a part of your practice to
20   inform him, but because there's a lot of
21   turnover and you may need to hire a lot, you
22   may forget sometimes; is that correct?
23      A   Yes.
24      Q   Could you hire as many employees as
25   you see fit?

43

M. KIM

1
2      A   There's a cashier, someone at deli
3   section, employees working in the kitchen and a
4   dishwasher.  That's it.
5      Q   How many people work in the kitchen?
6      A   Three.
7      Q   How many people work at the deli?
8      A   Four.  But one of them would work in
9   the kitchen and then at lunchtime then he would
10   work in the floor to help out.
11      Q   I count seven people so far.  Four in
12   the deli section, three in the kitchen.  How
13   many people worked for the cashier?
14      A   Three.  And one work as a floor man.
15   One person.
16      Q   Was does the floor man do?
17      A   He will restock sodas, make
18   additional deliveries.
19      Q   So there's one floor man; is that
20   right?
21      A   Yes.
22      Q   And what about the dishwasher, is it
23   just one dishwasher?
24      A   Yes, one person for that.
25      Q   For these current employees, who

42

M. KIM

1
2      A   I say yes, especially for nowadays.
3      Q   Would you have the ability to
4   determine that the deli needs more employees
5   than what you already have?
6      A   In cases like that, I would need to
7   talk to the owner, Mr. Sung, first.
8      Q   You can replace employees, but you
9   couldn't create a new position; is that right?
10      A   What I'm saying is I could, but I'd
11   rather ask.
12      Q   You could what?
13      THE INTERPRETER:  About the new
14   hire.
15      A   Yes.
16      Q   Do all of these employees work the
17   same hours?
18      A   They're different.  For some --
19   there's some, they report about 30 minutes
20   earlier than the others.  In case of
21   dishwasher, he is the one to leave the last,
22   because he has to wrap up by cleaning
23   everything.
24      Q   And who are the employees that
25   usually come 30 minutes earlier?

44

11 (Pages 41 to 44)

M. KIM

1
2      A    Those who has to make breakfast would
3    come 30 minutes earlier than others.
4      Q    What time do those individuals need
5    to show up?
6      A    The first arrival would be at 6:30
7    AM.
8      Q    And the folks who arrive at 6:30 AM
9    are nine individuals who make breakfast; right?
10     A    Yes, as well as those working the
11   kitchen.
12     Q    So would that be kitchen and deli
13   employees as you described them earlier?
14     A    Yes.
15     Q    And everyone else arrives at 7:00 AM?
16     A    Yes.
17     Q    What time do the employees leave for
18   the day?
19     A    Some leave at 3:00 PM, and some leave
20   at 3:30 PM or 4:00 PM or 4:30 PM.
21     Q    Who leaves at three?
22     A    The ones that arrive at 6:30 AM.
23     Q    So all the deli and kitchen guys work
24   from 6:30 to 3; is that right?
25     A    Yes, but there were some who worked

45

M. KIM

1
2      A    There was some changes.
3      Q    Tell me about those changes?
4      A    Okay, first of all, due to slow
5    business, we had change to eight hours, eight
6    hours daily.
7      Q    When was that?
8      A    I believe 2015.
9      Q    Do you recall more or less when in
10   2015?
11     A    January.
12     Q    Prior to January 2015, how many hours
13   a day did workers work?
14     A    Nine and a half hours.
15     Q    How did the business make the
16   decision to cut the daily hours from nine and a
17   half hours to eight hours?
18     A    Myself and Mr. Sung discussed it.
19     Q    Who made the ultimate decision?
20     A    Mr. Sung.
21     Q    Right now employees continue to work
22   eight hours daily?
23     A    Yes.  Exception of one person who's
24   working one additional hour daily.
25     Q    Who is that person?

47

M. KIM

1
2    from 7:00 to 3:30 as well.
3      Q    Who decides these schedules?
4      A    There are times I decide the work
5    hours and there are times when the employees
6    make request for that, their own request for
7    that to me.
8      Q    So you're saying the employees have a
9    say in what their schedules are?
10     A    My answer is yes, it's for those who
11   have second job.
12     Q    Maybe I should have confirmed this
13   earlier, but do all employees work Monday
14   through Friday?
15     A    Well, that is correct, Monday through
16   Friday, except for cashiers who are now
17   currently working Monday through Friday due to
18   slow business.
19     Q    So all the employees with the
20   exception of cashiers work Monday through
21   Friday?
22     A    Yes.
23     Q    Have these work schedules, the days
24   and hours that the employees work, remained the
25   same throughout your employment?

46

M. KIM

1
2      A    The floor man.
3      Q    Who is the floor man?
4      A    Name?
5      Q    Yes.
6      A    Sanchez.
7      Q    Is that his last name?
8      A    Jovanni Sanchez.
9      Q    Can you again explain to me what a
10   floor man does?
11     A    I was even willing to show up as
12   early as 6:00 in the morning to set up the
13   breakfast.  Likewise I was asking the floor man
14   to stay one additional hour to manage and clean
15   up and prepare the store for close.
16     Q    How does Silo Café keep track of
17   employee hours?
18     A    I took that responsibility upon
19   myself.
20     Q    Prior to when you started, do you
21   know what system was in place at Silo Café?
22     A    Prior to my arrival they were using
23   time cards.
24     Q    When did the business stop using time
25   cards?

48

12  (Pages 45 to 48)

M. KIM

1  
2    A   I was answering about using time  
3  cards about my prior employment.  
4    Q   My question, we are talking about 50  
5  Food Corp., we are talking Silo Café.  
6    A   No, this business did not use time  
7  cards.  
8    Q   Okay, thank you.  My understanding is  
9  that Silo Café was in operation for a few  
10  months, only a few months before you started;  
11  is that right?  
12    A   Yes.  
13    Q   Do you know what system was in place  
14  to track employees' hours during that period,  
15  before you started?  
16    A   I have no idea.  Maybe they were  
17  using a manual during that time.  Maybe there  
18  was a manager who could answer that then.  
19    Q   When you first started and Mr. Sung  
20  was training you, I believe you said for the  
21  first two months; is that right?  
22    A   Yes.  
23    Q   What, if anything, did Mr. Sung tell  
24  you to do to track the employee hours?  
25    A   As I mentioned there were forms he  

49

M. KIM

1  
2  used for that.  There were incidents where we  
3  had employees late, five, ten minutes, he said  
4  just excuse those situations.  So here is my  
5  chance to explain why we maintain the same  
6  start time and same ending time every day.  
7  Because Mr. Sung wanted -- opted to excuse  
8  minor latenesses, we always had the same start  
9  time, who are on the same shifts consistently,  
10  daily, and three to four PM was normally for  
11  closing, preparation time, where we need to  
12  clean up, so based on what each employee's  
13  shift was, we had always maintained same start  
14  and same departure time.  
15    MS. BARBOSA:  I'm just going to ask  
16    the court reporter to read that back.  
17    (Whereupon, the requested portion of  
18    the record was read back by the  
19    Reporter.)  
20    Q   So it was Mr. Sung's decision to have  
21  everyone have the same start time and end time  
22  each day?  
23    A   So if there was the lateness for 30  
24  minutes or more, then we will make the  
25  deductions, but if it was minor lateness, five,  

50

M. KIM

1  
2  ten minutes, we would not count them as a  
3  lateness.  By doing so, we were able to keep  
4  consistent start and ending time.  
5    MS. BARBOSA:  Thank you for  
6    explaining that.  
7    Q   Was it Mr. Sung's decision to have a  
8  consistent start and end time?  
9    A   Yes.  
10    Q   And my understanding, from your  
11  testimony, is that it was also Mr. Sung's  
12  decision to excuse minor lateness; is that  
13  right?  
14    A   Yes.  
15    THE INTERPRETER:  I guess it's not  
16    relevant, he just withdrew himself.  
17    Q   So the answer to my previous question  
18  was that, I'm sorry, I may not have heard it,  
19  so my understanding is that it was Mr. Sung's  
20  decision to excuse minor lateness; is that  
21  right?  
22    A   Correct.  
23    Q   So you described that there is the  
24  same start time and same end time, was there a  
25  fixed schedule for all employees?  

51

M. KIM

1  
2    A   Yes.  
3    Q   So there was a fixed schedule, are  
4  you telling me that there was no system in  
5  place to mark each day when employees came in  
6  and when employees left for the day?  
7    A   I believe there may have been a time  
8  when we're using that particular system you  
9  mentioned, but we did not feel the need to use  
10  that, because as I had mentioned before, you  
11  know, the employees were always leaving at the  
12  time they were expected to leave although some  
13  of them were late, which we excused them for as  
14  long as it's not over 30 minutes.  
15    Q   But you think that maybe in the past  
16  there was a document where you would track when  
17  people started and people ended on any given  
18  day?  
19    A   Are you saying did we use a system  
20  instead of what we had been keeping in practice  
21  currently?  
22    Q   That's right.  
23    A   Initially when I became employed at  
24  the business, I didn't have such practice, but  
25  it was later at Mr. Sung's request, I started  

52

M. KIM

1
2       recording the arrival and departure time.
3          Q   So Mr. Sung instructed you to record
4       the start and end times of each employee?
5          A   Yes.
6          Q   Do you recall when he instructed you
7       to do this?
8          A   It's hard to recall when that was.
9          Q   Was it a year ago?  Could it have
10      been more than three years ago?
11         A   Way before more than a year ago.  I
12      think that it must have been sometime in the
13      year 2009.
14         Q   Okay.  So when Mr. Sung instructed
15      you more or less in the year of 2009 to begin
16      recording employee's start and end time, did
17      you do that, were you recording their start and
18      end time?
19         A   Yeah, my answer is yes, initially,
20      it's yes, but at that time I began having
21      another, additional responsibility, so I more
22      or less maintain the same practice as I had
23      mentioned before, for example, if somebody who
24      was supposed to arrive at 6:30 arrives at 6:35
25      or a little later, I would still write 6:30.

53

M. KIM

1
2          Q   So it sounds like you did start
3       keeping some document where you recorded the
4       start and end times of employees.  Can you
5       describe to me what that document was?
6          A   It was something that I had prepared
7       myself, and I called it the attendance record.
8          Q   Was it a handwritten document?
9          A   I started as my handwritten document.
10         Q   And then what happened?
11         A   Subsequently, using the very same
12      form, I would make, input, computer input
13      instead of my own handwriting.
14             THE INTERPRETER:  Can we get a
15      little break?
16             MS. BARBOSA:  Sure.  Can I just
17      finish this line of questioning?
18             THE INTERPRETER:  Okay.
19         Q   For how long was it a handwritten
20      document?
21         A   I think that a year or up to two
22      years approximately.
23         Q   And then how long did you input
24      information in the commuter?
25         A   Up until now.

54

M. KIM

1
2          Q   Do you still have handwritten
3       attendance records?
4          A   Probably some are likely to have been
5       missing because especially for those that are
6       just very old.
7          Q   But you think that perhaps you still
8       have some of them?
9          A   I think it's quite probably I do
10      have.
11         Q   Did you ever look for these documents
12      to give to Mr. Sung when you were -- when he
13      asked for documents related to this lawsuit?
14         A   He did.
15         Q   You did?
16         A   Yeah, he hand over to him too.
17             MS. BARBOSA:  Okay.  I don't know if
18      we received those documents.  Maybe we
19      could discuss that later and see if we
20      can find it.
21             MR. VARACALLI:  Well, I think if you
22      ask more clarifying questions about what
23      he's referring to, it is possible that he
24      is referring to the document that he had
25      mentioned earlier in the deposition.

55

M. KIM

1
2             MS. BARBOSA:  All right.  Do you
3       want to take a break now?
4             THE INTERPRETER:  Yes.
5             MS. BARBOSA:  All right.  We will
6       take a five or ten minute break.
7             (Whereupon, a short recess was
8       taken, time noted:  12:23-12:30 PM.)
9          Q   Before we stopped for a break, you
10      were describing a document that you described
11      as an attendance record?
12         A   Yes.
13         Q   I believe you stated that you began
14      creating this document in 2009 as a handwritten
15      document; is that right?
16         A   I believe that is the case.
17         Q   And again, my understanding based on
18      your testimony from a few minutes ago, is that
19      this attendance record included the start time
20      and end time for each employee; is that right?
21         A   Yes.
22         Q   And you described these documents as
23      attendance records, was the title, attendance
24      record, ever written on top of these documents
25      or did it not have a title?

56

14  (Pages 53 to 56)

M. KIM

1
2      A   I do remember that it was bearing a
3  title of the document, but I don't know exactly
4  how it was worded, maybe working, I don't
5  remember.  I also was recorded that it was
6  prepared by myself.
7      Q   When you say it was prepared by
8  yourself, do you mean that it was your
9  handwriting?
10      A   Yes.
11      Q   Was there a table, an electronic
12  table that you -- diagram, that you filled in
13  the information or was it just your
14  handwriting?
15      A   I had prepared it manually, I just
16  drew lines and made handwritten input.
17      Q   When you say you prepared it
18  manually, so everything would be in your
19  handwriting?
20      A   Initially, I might have had the
21  employee names from the computer, the printout,
22  but about the start and end time, it was
23  prepared by hand, my handwriting, because
24  sometimes an employee could be late up to 30
25  minutes which I would need to record.

57

M. KIM

1
2      Q   Again, you stated earlier that you
3  submitted these documents to Mr. Sung when he
4  was asking for the documents related to this
5  litigation; right?
6      A   I did submit it to him at his
7  request.
8      MS. BARBOSA:  Can we stop?  Off the
9  record.
10      (Whereupon, an off the record
11  discussion was held.)
12      Q   Did you give any documents directly
13  to Mr. Varacalli?
14      A   None, everything I submitted was to
15  Mr. Sung only.
16      MR. VARACALLI:  Can I ask one
17  question?
18      MS. BARBOSA:  Sure.
19      MR. VARACALLI:  Was the document
20  that you're referring to as an attendance
21  record, the document that you emailed to
22  me after I sat with you at the 50 Food
23  Corp location?
24      THE WITNESS:  That was not the one I
25  was referring to as attendance record.

58

M. KIM

1
2      MR. VARACALLI:  Okay.
3      MS. BARBOSA:  Okay.  We can mark
4  this as Plaintiff's Exhibit 4.
5      (Whereupon, the above mentioned
6  document was marked as Plaintiff's
7  Exhibit 4 for identification, this date
8  by the Reporter.)
9      Q   So please review these four pages of
10  documents, they are printed front and back.
11      (Witness peruses document.)
12      Q   The first page of Plaintiff's Exhibit
13  4 is identified as D001334?
14      A   Yes.
15      Q   Do you recognize this first page of
16  this packet?
17      A   Yes.
18      Q   Is this the document that you were
19  describing earlier as attendance record?
20      A   I said, no, this was actually for Mr.
21  Sung's review.
22      Q   When you say for Mr. Sung's review,
23  what do you mean?
24      A   This was prepared by myself for Mr.
25  Sung to show the total expenditures paid to the

59

M. KIM

1
2  employees, this was necessary because sometimes
3  the salary amounts for any given employee would
4  vary.
5      Q   What do you call this document?
6      A   This is relating to the expenditures
7  used for salaries, so that's the best I can
8  describe what it is.
9      Q   Sure, I understand that.  Thank you.
10  For the purposes of consistency, can we refer
11  to this type of document as staff expenditure,
12  would that be okay?
13      A   Yes.
14      Q   How often would you create this
15  document for Mr. Sung's review?
16      A   This was already stored in the
17  computer, so Mr. Sung could have seen it daily
18  or weekly, I have no way of knowing.
19      Q   Did Mr. Sung instruct you to create
20  this staff expenditure document?
21      A   Yes.
22      Q   So you never actually needed to
23  directly personally show it to him, it was in
24  the computer which he had access to, that's my
25  understanding of your testimony; is that right?

60

15  (Pages 57 to 60)

M. KIM

1
2  A    Correct.  So I have no way of knowing
3  how often he saw it if at all.
4      Q    When did Mr. Sung instruct you to
5  keep this information?
6      A    From the very start, when I got
7  employed there.
8      Q    So you should have this staff
9  expenditure document for each week since you've
10  been employed at the café?
11      A    Yes.
12      Q    Would it be correct to say that the
13  weekly staff expenditure document remains saved
14  in the computer at Silo Café?
15      A    Yes.
16      Q    Did you turn over all of the staff
17  expenditure documents to either Mr. Varacalli
18  or to Mr. Sung?
19      A    Yes.
20      Q    Do you think that the documents he
21  submitted were for each week since you've been
22  employed at Silo Café?
23      A    I believe it was maintained up until
24  -- excuse me, I had missed something so I asked
25  him.  So the answer is yes, but I also want to

61

M. KIM

1
2  say that when we changed to a different
3  computer in the year 2008 or 2009 or so, a lot
4  of the information of this form or document was
5  deleted, so I believe the information for 2008
6  or 2009 for about a year or so, has been
7  deleted entirely and I eventually stopped
8  maintaining this record because it didn't seem
9  like Mr. Sung was reviewing the document, so
10  other than those times when the total amount of
11  the expenditure to the employees had changed, I
12  did not keep updating the weekly.
13      Q    When did you stop using this staff
14  expenditure document?
15      A    2017 maybe.
16      Q    And so what years are missing because
17  they were deleted from the computer?
18      A    Yeah, it could have been 2008, 2009
19  and even 2010.
20      Q    And again, this staff, what we have
21  identified as the staff expenditure document,
22  this is not the attendance document that you
23  were describing earlier; right?
24      A    Yeah, that's how I see it, they're
25  different documents.

62

M. KIM

1
2      Q    Can you please turn the page.  So
3  it's difficult to see the bates stamp on this
4  document, but I'm going to say that it is bates
5  stamped D000950.  This document has the title,
6  Payment Report and it looks like it's for Felix
7  Galindo; do you recognize this document?
8      A    Yes.
9      Q    What is this document?
10      A    It shows a total hours he worked in
11  that given week and his rate and the regular
12  earning and then overtime he worked and the
13  total 2.5 hours of lunch deduction which was 30
14  minutes daily and his total compensation for
15  that week.
16      Q    Is this the document that you were
17  describing earlier as the attendance record?
18      A    This is not the one that I was
19  referring to as the attendance record.
20      MS. BARBOSA:  Unless you can think
21      of any other clarifying questions, you
22      concede that you don't have the
23      attendance record.
24      MR. VARACALLI:  It would seem.
25      Q    What is the policy at 50 Food Corp

63

M. KIM

1
2  for breaks?
3      A    That all were given 30 minutes break
4  for lunch, initially it was fixed at 15 minutes
5  for breakfast, but maybe had not arrived in
6  time to take that 15 minute breakfast break, so
7  we gave them freedom to take that 15 minute
8  break any time they see fit.  Whatever the
9  case might be, it was all within the eight
10  hours a day work.
11      Q    So typically employees received both
12  the 30 minute break and a 15 minute break, that
13  fifteen minute break could have been taken in
14  the morning for breakfast or at any other point
15  during the workday; is that right?
16      A    Yeah, we just wanted the employees to
17  have freedom of taking break when it's more
18  feasible for them, so in reality the employees,
19  the work time, work hours was 7 hours and 45
20  minutes for their eight hour shift.
21      Q    Who determines when the employees
22  take the break?
23      A    I don't know what happened prior to
24  me, but I must have been the one who made that
25  decision.

64

16 (Pages 61 to 64)

M. KIM

1
2    Q    Since you have started at Silo Café,
3  you have been the only one to make the decision
4  as to when employees take their breaks; is that
5  what you're saying?
6    A    Yes, I say I was the one to make that
7  decision.
8    Q    And are the times and the amount of
9  time that employees took for breaks, is that
10  reflected in the attendance records that you
11  described earlier?
12    A    It was not reflected in that
13  attendance record that I had mentioned earlier.
14    Q    So the attendance record that you
15  discussed earlier only included the start time
16  and the end time and did not include anything
17  involving breaks?
18    A    That is correct.
19    Q    What time did employees usually take
20  the 30 minute break?
21    A    Again, depends on the employee, for
22  example, those who arrive at 6:30 AM would
23  normally take lunch at 2:00 PM and some people
24  do not want any breaks, so in those cases they
25  would just prefer to leave 30 minutes earlier.

65

M. KIM

1
2  employees?
3    A    Yes, there were something like that.
4    Q    Can you describe to me what those
5  are?
6    A    Okay. It makes references to those
7  who are habitually late to work or have
8  problems or arguments with customers or in case
9  of conflict or controversy between the
10  employees. Yeah, it does set forth that they
11  can be punished by being fired but in the
12  reality we -- it was never -- had never gone
13  that far where we had to fire someone for those
14  reasons.
15    Q    These policies that you described,
16  are these written employment policies?
17    A    Yes.
18    Q    Is this one document that includes
19  all of these policies that you described or are
20  they separate documents?
21    A    Just within one document.
22    Q    Who created this document?
23    A    I do not know that, because Mr. Sung
24  brought it to me.
25    Q    When did Mr. Sung bring it to you?

67

M. KIM

1
2    Q    Would it ever be the case that the
3  deli was too busy for someone to take a full 30
4  minute break?
5    A    I would not be surprised, yes, that
6  could have been.
7    Q    How often do you think this would
8  happen?
9    A    Once in a blue moon.
10    Q    When you say once in a blue moon, do
11  you mean -- I think if I could just instruct
12  Mr. Kim, I think it would be clearer for the
13  record if you continue speaking in Korean.
14  Please go ahead and state what you were
15  planning on saying.
16    A    I think that there really was no
17  occasion where one couldn't take lunch break
18  due to the busyness of the store.
19    Q    So you would always ensure that
20  workers would take 30 minutes?
21    A    Of course.
22    Q    Are there any written employment
23  policies distributed to employees?
24    A    Are you referring to a store policy?
25    Q    I'm referring to policies for the

66

M. KIM

1
2    A    I don't remember.
3    Q    Was it soon after you started at the
4  café?
5    A    I think only a little after I started
6  working at the café.
7    Q    Would you say he gave it to you
8  within one year of you starting at the café?
9    A    I think it was after a year had
10  passed by when I got it from Mr. Sung.
11    Q    Maybe within your second year at the
12  café?
13    A    I don't recall.
14    Q    What did Mr. Sung tell you to do with
15  this printed document that included employment
16  policies for the employees?
17    A    Okay, so when Mr. Sung presented me
18  with that document, he said that because of --
19  because he was concerned about my very soft
20  nature, and that there was a concern that some
21  people wanted to try to challenge me or out
22  power me by maybe breaking rules, like you
23  know, maybe being late or maybe even as bad as
24  stealing especially because there were so many
25  frequent turnovers, he thought that I may need

68

17 (Pages 65 to 68)

M. KIM

1
2    to abide by these policies.  And Mr. Sung also
3    mentioned that just by talking to the employees
4    about these rules, or when I try to reprimand
5    them, they do not really take me seriously so
6    he felt that there was a need to have a
7    document set forth like that.
8        Q   Did he tell you to distribute this
9    document to the employees?
10       A   He did.
11       Q   And when would you distribute this
12   document to employees?
13       A   I don't recall when I did.
14       Q   Did you only do it once or did you do
15   it various times?
16       A   I believe several times.
17       Q   Did you ever give Mr. Sung a copy of
18   this document with the employment policies,
19   would the other documents responsive to
20   plaintiff's request related to this case?
21       A   I don't recall if I did.
22       Q   Do you recall Mr. Sung asking you for
23   this document?
24       A   I don't think he did.
25       Q   Does the café have any posters that

69

M. KIM

1
2    inform the employees of their rights?
3        A   I don't think that it's there now
4    currently.  It was really mainly about the
5    hourly rate notices and rules for sick days.
6        Q   You don't recall the café ever having
7    a poster alerting employees what the minimum
8    wage is?
9        A   It is the same thing that we've been
10   talking about.
11       Q   What I'm describing is a poster, a
12   large piece of paper that would be hung on the
13   wall in the café?
14       A   I can only say that we had the,
15   posted on the wall, the hourly rate from the
16   national -- the labor board, excuse me.
17       Q   Did you hang this poster up in the
18   café?
19       A   It's posted in the room where the
20   employees change their clothing.
21       Q   My question is, who put the poster
22   up?
23       A   I did.
24       Q   Did anyone instruct you to do that?
25       A   Not necessarily somebody instruct me

70

M. KIM

1
2    to do that, but I just knew at one point that I
3    needed to do that.
4        MS. BARBOSA:  Mark this as
5    Plaintiff's Exhibit 5.
6        (Whereupon, the above mentioned
7    document was marked as Plaintiff's
8    Exhibit 5 for identification, this date
9    by the Reporter.)
10       Q   Plaintiff's Exhibit number 5 has been
11   bates stamped D000883.  Do you recognize this
12   document?
13       (Witness peruses document.)
14       A   I think it's likely that I have seen
15   it.
16       Q   What do you think it is?
17       A   I think this covers the new year
18   period, there were long breaks and Mr. Sung
19   wanted to compensate for that long break to the
20   employees by giving them hundred dollar bonus.
21       Q   So Mr. Sung made the decision to give
22   Mr. Galindo, in this case, a hundred dollar
23   bonus, is that what you're saying?
24       A   Yes, but if it would have been paid
25   to everybody else as well, not just to this

71

M. KIM

1
2    person.
3        Q   Did Mr. Sung often make the decision
4    to give bonuses to employees?
5        A   He did.
6        Q   This document which has the title,
7    Payment Report, when did you start using this
8    document entitled, Payment Report?
9        A   I'm not a hundred percent sure but it
10   must have been later, at the end of 2008 or
11   early 2009.
12       Q   Is it correct to say that in this
13   particular document, that this is your
14   handwriting, you're the person who filled out
15   this information?
16       A   Mine.
17       Q   Who instructed you to use this
18   template, this document, this already printed
19   out form of the payment report?
20       A   Mr. Sung brought it to me for use.
21       Q   What did Mr. Sung say to you when he
22   brought it to you?
23       A   Yeah, it was very self-explanatory,
24   what I needed to enter, input in these forms.
25       Q   Did he tell you why you needed to do

72

18 (Pages 69 to 72)

M. KIM

1  this?
2     A  Yeah, you know, it had -- there's the
3  recipient's signature which proves the money
4  was paid and recognized.
5     Q  Did he tell you how often you needed
6  to fill in this information?
7     A  Just for one week.
8     Q  So these were made on a weekly basis,
9  is that what you're saying?
10     A  Yes, weekly.
11     Q  Do you know if these payment reports
12  were used prior to when you became manager?
13     A  I have no recollection of that.
14     Q  Is the information in these weekly
15  payment reports accurate to the best of your
16  knowledge?
17     A  I believe they are.
18     Q  In determining the regular hours and
19  overtime hours in this document, did you refer
20  to any document?
21     A  I was using the time record that I
22  had prepared myself that I had mentioned
23  previously.
24     Q  You're referring to the attendance

73

M. KIM

1  record that we talked about earlier?
2     A  Yes.
3     Q  Well, I'm just going to refer you to
4  the column that's titled, Deduction?
5     A  Yes.
6     Q  It says, lunch, 1.5, does that mean
7  that 1.5 hours were deducted this week for
8  lunch break?
9     A  Yes.
10     Q  How did you determine that Mr.
11  Galindo, during this week, took exactly one and
12  a half hours for lunch?
13     A  First of all, he worked three days
14  and I also want to say that either he had taken
15  that 30 minutes for his lunch break or he had
16  left 30 minutes early so I consider that 30
17  minutes of lunchtime.
18     Q  Were you referring to any specific
19  document about the amount of break time that
20  Mr. Galindo took or was this just based on your
21  knowledge that was in your head?
22     A  There was supporting document, the
23  one that I had mentioned previously, that I
24  prepare myself.

74

M. KIM

1     Q  I believe you testified earlier and
2  please correct me if I'm wrong, that the
3  attendance record that you created and kept for
4  several years only included the start time and
5  end time; is that correct?
6     A  Yes.
7     Q  So how could that document help you
8  in determining how much time was taken for
9  break?
10     A  The way I looked at it is that if the
11  attendance record that I kept for myself, that
12  it reflects that he had left 30 minutes later
13  than his usual shift, I would know that -- I
14  would know what to deduct as well as if it
15  wasn't, I will still know that he had 30
16  minutes lunch break.
17     Q  How would you know that he still had
18  30 minutes lunch break?
19     A  Then I will challenge you by saying
20  that he may not have taken 30 minutes break but
21  at the same token he could have taken 45
22  minutes break for lunch.
23     Q  I guess, please correct me if I'm
24  wrong, but the point that I am trying to

75

M. KIM

1  confirm is that there is no document that you
2  kept that indicated the amount of break that
3  somebody took on a daily basis; is that right?
4     A  No, the answer is no. But -- okay, so
5  my argument to prove my point is that while
6  there was no separate document to record those
7  break status, as I mentioned before, a person
8  could start the break at ten and spend up to 15
9  minutes or he could spend nearly 30 minutes for
10  his break and it was understood, it was
11  understood, so likewise that is the way I kept
12  it from the attendance record by indicating
13  their start and end time.
14     Q  Okay.  I see that the payment reports
15  includes a column for regular hours and a
16  column for overtime hours; is that right?
17     A  Yes.
18     Q  How did you know what hours to input
19  in the overtime hours column?
20     A  Initially, as I mentioned, everybody,
21  every employee's start time could be different
22  and, as I mentioned, my boss forgave minor
23  latenesses as though they reported on time,
24  they arrived on time.  And our closing time was

76

19 (Pages 73 to 76)

M. KIM

1
2 either always the same time, if not earlier,
3 never later.  So as of 3:00 PM, the customers
4 stopped coming to the store.  That is the
5 reason why we use one hour for cleaning up the
6 store to prepare for the closure.  So for those
7 who wanted to leave early would do speed
8 cleaning, they would try to move fast.  What I
9 mean is that because I allowed them to, the
10 employees to leave early, they were interested
11 in working faster so that they can leave early.
12 For those reasons, the overtime can always be
13 consistent without any variation.
14     Q   I'm not sure I understand.
15         THE INTERPRETER:  Neither do I.  I'm
16 sorry.
17     Q   Are you saying that you wanted
18 employees to have the same amount of overtime
19 hours every week?
20     A   Yes, that is because the café is
21 located inside, in the basement, and had we
22 been located outside to be seen by the
23 passerby, chances are they're likely to walk in
24 even after three.  And then we'll just -- we
25 will have no choice but to greet the customers

77

M. KIM

1
2 and serve them.  But as I mentioned, the store,
3 no customers would enter after 3:00 PM which
4 means, we cannot give any employees overtime
5 even if we wanted to, there was no need for it.
6     Q   I appreciate that information, but
7 I'm not sure if it's really responsive to my
8 question.  I think this could be a lot easier
9 if you could listen to my question and answer
10 my question without providing a -- so are you
11 telling me that the amount of overtime hours
12 that you entered into this document was based
13 on the amount of salary that you wanted to make
14 sure that each employee earned at the end of
15 the week?
16     A   The extra, that's not the case,
17 because as you can see there is the regular
18 hours indicated here (indicating).
19     Q   So in this instance, why was, why do
20 you think Felix Galindo only received 24
21 regular hours?
22     A   Because he was working eight hours a
23 day.  And as I said before, we close our
24 business early, for that reason, and just
25 because we close early, you know, we couldn't

78

M. KIM

1
2 just hire additional help.  So instead of
3 hiring somebody for -- to work one and a half
4 additional hour, we just wanted to give an
5 employee an overtime of one and a half hour.
6     Q   Okay.  So in this document, the total
7 is $399.79, so is that the amount, do you think
8 that amount is accurate as to the amount that
9 Mr. Galindo received in this week in 2013?
10     A   Yes.
11     Q   So he was actually given out 79 cents
12 in coins; is that right?
13     A   No, I paid 400.  Yeah, Mr. Sung told
14 me to pay him $400 because it's only 21 cents
15 shy of $400.
16     Q   You recall Mr. Sung telling you on
17 this particular week to pay Mr. Galindo $400 or
18 are you just saying that Mr. Sung would
19 instruct you to round up for all payments made
20 to employees?
21     A   That applies to all the employees.
22     Q   When did Mr. Sung instruct you to do
23 this?
24     A   This was even from the initial, when
25 I initially, when I started filling these forms

79

M. KIM

1
2 out.  This is really same thing as when Mr.
3 Sung practiced about forgiving minor
4 latenesses.
5     Q   So my question is when, when did Mr.
6 Sung tell you, do you recall when he said,
7 listen, you should really round up when paying
8 out employees their weekly salary?
9     A   That was the case from soon as --
10 soon after I began working at that business.
11     Q   Okay.  Got it.  So I want to draw
12 your attention to the signature line, do you
13 recognize that to be Mr. Galindo's signature?
14     A   Yes, but sometimes his signature
15 looks quite different from this one.
16     Q   Why is that?
17     A   I have no idea.
18     Q   When would employees typically sign
19 this document?
20     A   The moment they received the wages.
21     Q   Who asks for their signature?
22     A   I do.
23     Q   Are you the one who also hands over
24 their wages?
25     A   Yes.

80

20 (Pages 77 to 80)

M. KIM

1
2    Q   Is it correct that Mr. Galindo along
3  with the other two plaintiffs, Esteban Perez
4  and Delfino Lopez, were paid in cash?
5    A   Yes.
6    Q   So you paid the cash to them directly
7  each week; is that right?
8    A   Yes.
9    Q   Could an employee receive their wages
10  without signing this document?
11    A   Yes, there were occasions when
12  employees receiving their wage did not sign
13  although Mr. Sung did not -- was not aware of
14  it. That's because when I'm very busy, I
15  forget to present this form when the payment
16  was made to a certain employee and I will get
17  the signed form at a later time, like the next
18  day. Although, Mr. Sung would not permit that.
19  According to Mr. Sung, he would -- he was very
20  strict about getting an employee's signature
21  when they received the wage, but in case of
22  certain employee, I know that person for long
23  time, and know very well about each other, so I
24  would inadvertently permit that.
25    Q   Did Mr. Sung ever discover that some

81

M. KIM

1
2  signature lines were left blank?
3    A   I say he wouldn't know because even
4  myself, would make a mistake like that.
5    MS. BARBOSA:  Can you mark this as
6  Plaintiff's Exhibit 6?
7    (Whereupon, the above mentioned
8    document was marked as Plaintiff's
9    Exhibit 6 for identification, this date
10    by the Reporter.)
11    Q   Please look at what has been
12  identified as Plaintiff's Exhibit 6.
13    (Witness peruses document.)
14    Q   I think earlier we decided that we
15  would call this type of document which has been
16  labeled as D001276 as staff expenditure; is
17  that right?
18    A   Yes.
19    Q   And my understanding is that Mr. Sung
20  instructed you to keep this document and fill
21  it out on a weekly basis; is that right?
22    A   Yes, he did, and up to a certain
23  period of time, I maintained it as he
24  instructed me. But I don't know when, but at
25  one point I would just insert the total amount,

82

M. KIM

1
2  expenditure amount, based on any changes, if
3  there were any.
4    Q   Okay. So the first page of this
5  document, it looks like it's for the time
6  period of March 4 through March 8 of 2013, do
7  you agree?
8    A   Yes.
9    Q   So the first column includes the
10  employee's name; is that right?
11    A   Yes.
12    Q   The second column is what their
13  position was at that time, the third column
14  says, working time, what do you understand that
15  column to reflect?
16    A   I just want to reiterate that this
17  form, this particular form, was already being
18  used when I first began working for this café.
19    Q   I understand that, thank you.
20    THE INTERPRETER:  But the question
21  remains.
22    Q   Can you respond to the question, so
23  the question, what does that third column
24  represent, the column that's entitled, working
25  time?

83

M. KIM

1
2    A   Their shift hours, work hours.
3    Q   Okay. And then the fourth column
4  when it says, wage, is that the employee's
5  hourly rate?
6    A   The answer is yes, but it's quite
7  possible that I did not update it when I needed
8  to.
9    Q   What do you mean?
10    A   I would -- what I am saying is that I
11  was maintaining this and updating as necessary
12  so for example, if I was updating the salary
13  amount, I could have likely neglected to update
14  the wages and the other information.
15    Q   Is that because when you made changes
16  to an employee's salary, you made changes to
17  what their weekly salary was?
18    A   Well, in case of the salary column
19  where you see everything is rounded off which
20  was based on Mr. Sung's instructions, so for
21  example, if there's $400, it could have been
22  say $399.75 which was rounded to $400 for the
23  easier calculation and I had totaled the total
24  expenditure.
25    THE INTERPRETER:  He says not to

84

21  (Pages 81 to 84)

M. KIM

1    say, but I have to say what he says.
2        A    In prior occasions, I had rounded off
3    the $400 instead of something like this,
4    $399.79 and Mr. Sung found out about it, and
5    you know, he wanted me to not to do that.
6    Because I wrote $400 because I did actually pay
7    $400.
8        Q    Okay.  So you feel confident that the
9    salary column is the correct amount of money
10   that was paid out to employees on a weekly
11   basis?
12       A    I say I am convinced that those were
13   the right amount that was actually paid to each
14   given employee, but I think that this form is
15   more accurate than any other form and I use
16   this form when I update it, even then I could
17   have probably neglected to update certain
18   numbers in this form.  Because I say this is
19   very accurate because this is exactly what was
20   paid, reflects exactly what was paid to any
21   given employee because he signed, the recipient
22   signed the receipt of that amount.
23       Q    Okay.  Can you turn to the last page
24   in this packet of documents?

85

M. KIM

1        (Witness peruses document.)
2        Q    So this document is identified by
3    bates stamp D000146.  Would you agree that the
4    date of this payment report matches the date of
5    the staff expenditure form on the first page?
6        (Phone rings.)
7        MS. BARBOSA:  We will take a break
8    for a moment.
9        (Whereupon, a short recess was
10   taken, time noted:  1:38-1:40 PM.)
11       MS. BARBOSA:  Since we took a break,
12   would you mind reading back the question?
13       (Whereupon, the requested portion of
14   the record was read back by the
15   Reporter.)
16       A    Yes.
17       Q    And could you explain again why the
18   regular rate on this payment report would be
19   different from the regular rate for Mr. Perez
20   on the staff expenditure sheet?
21       A    I did my best explaining the reason
22   why.  That's because I changed the salary
23   amount by rounding off but in actuality, it's
24   the same thing.  The total amount are the same.

86

M. KIM

1        Q    So your explanation as to why the
2    regular rate is 9.36 on the payment report, but
3    7.80 on the staff expenditure form is just
4    because you rounded up the total salary from
5    $479.70 to $480.00?  Why don't you translate
6    that?
7        A    It may not be easy for you to
8    understand the concept here but as I mentioned
9    before I was only updating the total amount
10   paid to each given employee and when there was
11   a change to that, I would update it, often not
12   updating hourly wage, that is the reason for
13   the difference of the hourly rate in those two
14   documents.
15       Q    Was the salary column more often
16   updated because employees were receiving a
17   weekly salary?
18       A    That too, but this document was for
19   the purpose of presenting it to the -- to Mr.
20   Sung really.
21       Q    Okay.  I guess my question is did you
22   often update this column because you understood
23   and employees understood that they typically
24   received a weekly salary as opposed to an

87

M. KIM

1    hourly rate?
2        A    I just want to recap again that I've
3    been working there ten years or so and I
4    already know what each given employee gets as
5    their weekly salary.  And this document was
6    really for Mr. Sung to -- Mr. Sung's review
7    only and I wanted to update him as to what each
8    employee was getting during certain work
9    period.
10       Q    Thank you for clarifying that.  My
11   understanding is that although there was a
12   column for an hourly rate, that information
13   really didn't matter because you understood
14   that employees were actually getting a weekly
15   salary, is that what you're telling me?
16       A    Yes.
17       Q    So for this particular week, you
18   wanted to ensure that Mr. Esteban Perez was
19   going to get his promised weekly salary of
20   $480, is that what you're telling me?
21       A    Yes.
22       Q    So each employee was expecting that
23   they would receive their weekly salary, the
24   same weekly salary each week and you just

88

22 (Pages 85 to 88)

M. KIM

1  needed to change the hourly rate so that it
2  would come out to their promised weekly salary,
3  is that what you're saying?
4      A   This is only for Mr. Sung's view only
5  and the total amount paid to each employee was
6  the most important thing which is reflected
7  here.
8      Q   Did the employees understand that
9  they were getting a weekly salary?
10     A   Yes, it is stated so here in this
11  payment report form, that they were getting
12  weekly rate. Weekly pay, yes.
13     Q   Do you understand the difference
14  between a weekly salary and an hourly rate?
15     A   Yes.
16     Q   What is the difference?
17     A   Hourly rate is just that, hourly
18  rate. So based on how many hours work at
19  certain hourly rate, the weekly salary can
20  change.
21     Q   Is that how you understood the
22  employees were paid at Silo Café?
23     A   That is my understanding, that is my
24  belief, I've always explained to the employees.

89

M. KIM

1  I have couple of times explained to the
2  employees as I give them this form with their
3  payment the content of this form. And in fact,
4  certain employees that they wanted to have the
5  physical copy of these payment report when they
6  were paid their wages. So I believe they knew
7  what the content of this document means.
8      MS. BARBOSA:  We will put aside
9  Plaintiff's Exhibit number 6 for the time
10  being. Mark this as Plaintiff's Exhibit
11  7.
12     (Whereupon, the above mentioned
13  document was marked as Plaintiff's
14  Exhibit 7 for identification, this date
15  by the Reporter.)
16     Q   This document, Plaintiff's Exhibit 7
17  consists of four pages. The first page is
18  identified by bates stamp D001388.
19     By looking at this document, would
20  you agree that this is the staff expenditure
21  form for the time period April 27 through May
22  1, 2015?
23     (Witness peruses the document.)
24     Q   Do you need me to repeat the

90

M. KIM

1  question?
2      A   This is the same thing, literally.
3  Yeah, you just need to be concerned about the
4  total salary amount for each employee, that's
5  all.
6      Q   Thank you but the question was, would
7  you agree that this is the staff expenditure
8  form for the period April 27 through May 1,
9  2015? If you can look at the date on the top
10  of left corner, please look at the first page,
11  I'm asking you about the first page.
12     A   Yes.
13     Q   So if you could look at the second
14  page, do you recognize this document?
15     A   Yes.
16     Q   Would you agree that this is a wage
17  notice signed by Mr. Felix Galindo dated April
18  29, 2015?
19     A   Yes.
20     Q   Is that your signature in the
21  preparer's name field?
22     A   Yes, it is myself.
23     Q   On this wage notice what is Mr.
24  Galindo's hourly rate?

91

M. KIM

1      A   $10.13.
2      Q   Number 4 on this notice indicates
3  that allowance is taken for tips, did Mr.
4  Galindo regularly receive tips?
5      A   Yes.
6      Q   When did he receive tips?
7      A   Every day, in the morning. Yeah,
8  what time of the day, I don't know.
9      Q   Was a credit taken against his hourly
10  rate for the tips he received?
11     A   No.
12     Q   The wage notice indicates that his
13  hourly rate is $10.13 but on the front page, on
14  the first page on the staff expenditure form,
15  his hourly rate says 9.36; is that right?
16     A   Yes.
17     Q   So which one, which form indicates
18  what his correct hourly rate was during this
19  period?
20     A   This is, (indicating).
21     Q   When you say this is, you're
22  referring to the wage notice that's dated April
23  29, 2015?
24     A   Yes.

92

23 (Pages 89 to 92)

M. KIM

1
2      Q   Did you prepare each of the wage
3   notices in this packet?
4      A   Only when the rate changed, I
5   reviewed them.
6      Q   That's not my question.  My question
7   is, there are one, two, three wage notices in
8   this packet, one for Mr. Galindo, one for Mr.
9   Perez and one for Mr. Lopez, are you the one
10  who completed these documents and signed it?
11     A   Yes, I used, I looked at the
12  supporting documents to fill it out and signed
13  it for each person.
14     Q   Who instructed you to fill out this
15  document?
16     A   My boss asked for it.
17     Q   You said your boss asked for it, your
18  boss meaning Andrew Sung?
19     A   Yeah, Mr. Sung, Andrew Sung.
20     Q   So Mr. Sung instructed you to fill
21  out this document; is that right?
22     A   Yes.
23     Q   When was the first time he instructed
24  you to fill out this document?
25     A   I think somewhere starting, at the

93

M. KIM

1
2   that you mentioned at the café.  But in fact,
3   but in fact, Mr. Sung would know if there is an
4   accountant doing those tasks.
5      Q   Who was in charge of doing the
6   payroll?
7      A   You mean distributing wages to the
8   employees?
9      Q   Determining how much each employee
10  would receive, if the person was paid by check,
11  making sure the check was created for that
12  employee and then distributing the payment to
13  employees?
14     A   About a year or two I believe the
15  owner, Mr. Sung, managed that himself, and upon
16  my being hired, I took care of those payroll
17  duties.
18     Q   Are you saying that for the first two
19  years that you were employed by the café, Mr.
20  Sung was in charge of the payroll and then
21  after your second year, you took over?
22     A   Yes; correct.
23     Q   Does 50 Food Corp have a bank
24  account?
25     A   Yes.

95

M. KIM

1
2   end of 2009 or early 2010, about then.
3      Q   What did he tell you about this
4   document and how often it needed to be filled
5   out?
6      A   He said that when we have new hire we
7   have to use these forms to inform the new hire
8   as well as to update the hourly rate when
9   necessary.
10     Q   Did he only have a discussion with
11  you about the importance of completing this
12  document once or did you guys have several
13  conversations about this document?
14     A   More than once did he tell me this.
15     Q   How many times would he instruct you
16  to complete this document?
17     A   I believe he said it about three to
18  four times.
19     Q   And would it be correct to say that
20  the information in these notices are accurate?
21     A   I believe they are accurate because I
22  filled them out myself.
23     Q   Does Silo Café have a bookkeeper or
24  accountant?
25     A   No bookkeeper, no one, the capacity

94

M. KIM

1
2      Q   Who has access to the bank account?
3      A   Mr. Sung did.
4      Q   Do you have access to the bank
5   account?
6      A   Only thing I did was to make
7   deposits, that's it.
8      Q   How would you receive the cash to pay
9   salaries to the employees?
10     A   We normally used the money cashes
11  from sales, if we needed more, Mr. Sung would
12  bring it.
13     Q   How often would Mr. Sung provide the
14  cash to you that you used to pay the employees?
15     A   For about a year or two after I
16  started working there, he would frequently fund
17  the cash needed to pay wages to the employees.
18     Q   And then after those first two years?
19     A   So for about a year or two, he more
20  or less stopped and again started, but recently
21  started again funding cash to pay wages to
22  employees recently, in recent years.
23     Q   Beginning in what year, we are in
24  2018 now?
25     A   I -- from last year or beginning year

96

24 (Pages 93 to 96)

M. KIM

1           M. KIM
2   2016.
3     Q   What day is usually payday?
4     A   Wednesday or Friday. But we often
5   paid more on Wednesdays compared to Friday.
6     Q   Would Mr. Sung be at the café on
7   Wednesdays when you would pay employees?
8     A   It's not regular, but it all depends,
9   you know, how much money I need and when I need
10   it, so he could be just to come in Wednesday, I
11   mean Monday evening to bring cash, and he would
12   just normally leave, he doesn't stay in the
13   store.
14     Q   Do you know if 50 Food Corp carries
15   any insurance policies?
16     A   Of course.
17     Q   What insurance policies are you aware
18   that 50 Food Corp has?
19     A   Something from umbrella company. I
20   don't know exactly what insurance that was for.
21   But I do -- I'm aware there is insurance for
22   the store.
23     Q   You indicated earlier that the 50
24   Food Corp does have a bank account that both
25   you and Mr. Sung have access to, is there only

97

M. KIM

1           M. KIM
2   one bank account or several bank accounts?
3     A   It's actually only accessible by my
4   boss, Mr. Sung.
5     Q   But you were able to make deposits?
6     A   Merely, only deposits.
7     Q   How many bank accounts are you aware
8   that 50 Food Corp has?
9     A   I know there's only one.
10     Q   Okay, you're aware of only one?
11     A   Yeah.
12     Q   What bank is it?
13     A   Citibank.
14     Q   What location do you go to to make
15   your deposits?
16     A   It's actually just across the street
17   from the store on Third Avenue.
18     Q   Is the account in Mr. Sung's name or
19   the corporation's name?
20     A   It's 50 Corporation.
21     MS. BARBOSA: Off the record.
22     (Whereupon, an off the record
23   discussion was held.)
24     (Whereupon, a short recess was
25   taken, time noted: 2:08-2:33 PM.)

98

M. KIM

1           M. KIM
2     Q   So I just have a few questions
3   regarding the operations of the business.
4     Who typically would be responsible
5   for opening the mail that 50 Food Corp would
6   receive?
7     A   So mail from Con Edison or Verizon or
8   utility bills, I open and manage them, but
9   anything else more important than that, would
10   be under Mr. Sung's management.
11     Q   Would you be in charge of paying both
12   the Con Ed and the Verizon bill?
13     A   Sometimes I do, sometimes I don't.
14     Q   I think you indicated earlier that
15   Mr. Sung would give you a check on a monthly
16   basis to pay the rent; is that right?
17     A   Yes.
18     Q   Besides Con Ed, Verizon and basic
19   utilities, what other bills would 50 Food Corp
20   regularly receive?
21     A   We would get bills for uniforms.
22     Q   What types of uniforms?
23     A   Those were for the employees,
24   something similar to chef uniforms.
25     Q   What employees would use uniforms?

99

M. KIM

1           M. KIM
2     A   Everyone does.
3     Q   How many uniforms were given to each
4   employee?
5     A   They get it every day, new one.
6     Q   They get a new uniform every day?
7     A   Yes.
8     Q   What does the uniform consist of?
9     A   Chef uniform.
10     Q   Please describe to me what that is?
11     A   The gown, the chef uniform.
12     Q   Is it a shirt?
13     A   Just a top short top, uniform, like a
14   chef wears.
15     Q   Like a jacket, like a white jacket,
16   is that what you mean?
17     A   Yes.
18     Q   Is that the only thing the uniform
19   would consist of?
20     A   Other than that, there was another
21   type made out of lighter fabric, but that's the
22   same type.
23     Q   So besides this jacket, that was the
24   uniform, the jacket, that's it?
25     A   That and apron, rags for washing.

100

M. KIM

1
2      Q    This chef white jacket that you
3   described, was that made out of a cotton
4   material?
5      A    Right.
6      Q    And the employees received a brand
7   new white cotton chef jacket every day?
8      A    Depending upon the vendor that we
9   use, sometimes they replenish the new fresh
10  washed uniform or a brand new uniform daily.
11     Q    And the employees never took home
12  this jacket, they would just return it to you
13  when they were done for the day and you would
14  send it to a company to be laundered; is that
15  what you mean?
16     A    Yes.
17     Q    Did employees have to pay for their
18  uniforms?
19     A    No.
20     Q    Did they have to pay for the
21  laundering of their uniforms?
22     A    No.
23     Q    You indicated earlier that the
24  plaintiffs in this lawsuit were always paid by
25  cash; is that right?

101

M. KIM

1
2      A    Yes.
3      Q    How about some, how about the other
4   workers at 50 Food Corp., were these
5   individuals paid by cash or by check?
6      A    Nearly all the employees wanted to be
7   paid by cash, yeah, so, and then for those who
8   wanted to be paid by check, we accommodated
9   their request as well.
10     Q    I appreciate the information about
11  what employees preferred, but I guess I would
12  like to know currently, for example, currently,
13  how many employees are paid just by cash?
14     A    I guess about ten employees, let's
15  just say that most employees from South America
16  all wanted to be paid by cash.
17     Q    So ten out of the twelve to thirteen
18  are all paid in cash?
19     A    Yes.
20     Q    And what individuals are -- are the
21  other two to three employees paid just all of
22  it in check?
23     A    The remaining two or three are paid
24  half cash, half check.
25     Q    What employees are those who receive

102

M. KIM

1
2   half cash, half check, what positions do they
3   hold in the company?
4      A    Regardless of their title position
5   it's paid the way they wanted to be paid.
6      Q    My question is, what positions, what
7   positions right now are being paid by half
8   cash, half check?
9      A    The cashier and the chef.
10     Q    Anyone else?
11     A    Myself.
12     Q    Paid both by cash and by check?
13     A    Actually the -- we get more than half
14  in cash.
15     Q    And the checks you receive are 50
16  Food Corp checks?
17     A    Yes.
18     Q    Are employees paid by weekly
19  salaries, daily rates or hourly rates?
20     A    They are paid by hourly rate, every
21  week.
22     Q    Every single employee is paid an
23  hourly rate?
24     A    Exclusion of myself and the chef.
25     Q    Who determines what an individual's

103

M. KIM

1
2   pay rate is?
3      A    About what rate or what the wage they
4   would be?  It's ultimately decided by the
5   owner, Mr. Sung.
6      Q    When you say it's ultimately decided
7   by the owner, when would he make this decision,
8   for example, if you had a new employee?
9      A    So upon hiring an individual, he
10  would -- I would compare existing employee
11  currently doing similar work the new individual
12  would be hired for and offer comparative rate,
13  but for example, if I'm paying someone $500
14  weekly for the same, the capacity as the new
15  hired, I would not be able to pay $550.00 to a
16  new hire.
17     Q    What role does Mr. Sung play in this
18  decision-making?
19     A    But what I really wanted to say is
20  that I cannot offer new hire what is not really
21  comparable to existing employee doing the same
22  capacity, paying him $50.00 more or a hundred
23  dollars more weekly.  So I would have to confer
24  with the owner for anything like that for his
25  ultimate decision.

104

26 (Pages 101 to 104)

M. KIM

1
2    Q   My understanding of what you just
3   said is that you had the power to offer the
4   same salary to new employees as the employee
5   who held that position earlier, any change to
6   that already fixed rate would have to be
7   confirmed by the owner; is that what you're
8   telling me?
9    A   Yes.
10    Q   Thank you.  In reviewing the
11   documents that were produced in response to
12   plaintiff's request, I see that it was quite
13   common for employees to receive raises; is that
14   right?
15    A   Yes.
16    Q   Who would make the decision to give
17   employees raises?
18    A   So I really want to go back to the
19   nature of our business.  Based on our location
20   we can only do five days a week as I mentioned
21   before, but there are times when we can only
22   offer three to four days a week, so the owner
23   tries to make up for that loss by gifting
24   bonuses for half day or for a full day and that
25   used to be the way it had been, but since the

105

M. KIM

1
2   decline of business, the owner was not able to
3   continue those bonuses.
4    Q   Thank you for that information.  But
5   I want you to answer the question I asked;
6   okay?
7        The question is, who makes the
8   decision to give employees raises?
9    A   By Mr. Sung.
10    Q   Is there a place where files or
11   papers, a particular place where file or papers
12   are kept at Silo Café?
13    A   I believe it's in Mr. Sung's
14   possession.
15    Q   My question is where at Silo Café are
16   documents related to the business kept, where?
17    A   In the office where he is, in Mr.
18   Sung's office.
19    Q   When you say Mr. Sung's office, are
20   you referring to a space within the café at 805
21   Third Avenue?
22    A   Yes.
23    Q   So there is an office, is it in the
24   back?
25    A   Next to the kitchen.

106

M. KIM

1
2    Q   Who has access to that office?
3    A   Actually just myself and Mr. Sung,
4   but I did keep it open because sometimes
5   employees need supplies such as like gloves and
6   things like that for their work and I wanted
7   them to be able to help themselves.
8    Q   Where in that office are files kept?
9    A   Some were in the computer, some were
10   in the box.
11    Q   So you're saying that there are
12   documents that are stored electronically in the
13   computer?
14    A   They might be, they might be.  Only
15   to the extent something like this, which I was
16   involved in preparing, but any other related,
17   business related document, I cannot really say.
18    Q   Okay.  Are there any paper documents,
19   based on your knowledge, that is kept, that are
20   kept in that office?
21    A   I think it's probably likely there
22   must have been hard copies of documents, but I
23   have no independent confirmation for that.
24    Q   How often do you use that office?
25    A   I open the office, that office, so I

107

M. KIM

1
2   go there every day, every morning.
3    Q   Are there cabinets in the office?
4    A   Yeah, a small cabinet, yes.
5    Q   Are you aware of what's inside that
6   cabinet?
7    A   I don't -- I'm not interested, but I
8   personally organize vendor invoices in that
9   office.
10    Q   I understand that you're not
11   interested what's in the cabinets, but do you
12   know what's in the cabinets?
13    A   In fact I really don't.
14    Q   There's only one cabinet in the
15   office?
16    A   There are two small cabinets.
17    Q   Do you have any knowledge of what's
18   kept in that second cabinet?
19    A   I seem to remember seeing some
20   blueprints or like a construction related
21   drawings and I knew that Mr. Sung used to be
22   some kind of architect.  That was my
23   understanding.
24    Q   So have you ever stored anything in
25   any of those cabinets?

108

27  (Pages 105 to 108)

M. KIM

1
2    A    My, anything that belongs to me, you
3  mean?
4    Q    Could belong to you, could belong to
5  the company, have you ever put anything in the
6  cabinet?
7    A    Of the two cabinets I only used one
8  that was in use for vendors only.
9    Q    Where would you store the attendance
10 records that you described earlier?
11   A    Initially it was kept in one of those
12 two cabinets, but we been maintaining for many,
13 many years and we needed to put more
14 information as well, so I put those records in
15 a box and left it on the floor.
16   Q    Is that box still there?
17   A    Well, I do want to explain that those
18 documents that were kept in the box which was
19 on the floor, over half of it got damaged
20 because there was a flooding situation in that
21 wooden floor where the folder box was kept, you
22 might be aware of that incident that happened
23 to our store, with flooding situation.
24   Q    Didn't you tell me earlier that you
25 handed over some of these written attendance

109

M. KIM

1
2  records to Mr. Sung?
3    A    I did, but so I need to elaborate
4  that. I did hand over what Mr. Sung asked for,
5  but as I said, it was accumulated for many,
6  many years and for the old ones I had placed
7  them in a large box and left them on the wood
8  floor and the more recent ones, I'm maintaining
9  them well now.
10   Q    Where are the documents that you gave
11 to Mr. Kim within the last couple of months,
12 attendance records, where are the attendance
13 records that you gave to Mr. Sung, that you
14 gave to him within the last couple of months?
15   A    The reason was, which is part of what
16 I submitted to Mr. Sung at his request, are
17 being well kept and maintained, but I was
18 really referring to the old ones which I
19 decided, which I had, keep in a box on wooden
20 floor, which later got soaked from flooding
21 situation.
22   Q    I want you to make sure to listen to
23 my question carefully and try just to answer
24 what I'm asking you or we are going to be here
25 much longer.

110

M. KIM

1
2    You handed over some documents that
3  you described earlier as attendance records to
4  Mr. Sung; is that right?
5    A    Yes.
6    Q    Where are those documents now?
7    A    Those are being kept by Mr. Sung
8  because I gave it to him.
9    Q    Okay. So right now if you were to
10 return to the office at 805 Third Avenue there
11 would be no box or no place in the office where
12 these attendance records would be; is that what
13 you're telling me?
14   A    Correct.
15   Q    Thank you. Do you have a set policy
16 as to how long hard copy documents are kept in
17 the office of Silo Café?
18   A    Mr. Sung did not make a specific
19 mention about it, but I thought about three
20 years would be reasonable.
21   Q    Is that more or less how long
22 documents are maintained for?
23   A    Yes, I would have to say that is
24 fair, fairly accurate.
25   Q    You mentioned that there's a computer

111

M. KIM

1
2  in this office; is that right?
3    A    Yes.
4    Q    Who is able to use this computer?
5    A    Mr. Sung and myself.
6    Q    Is there a password on the computer?
7    A    Yes.
8    Q    And only you and Mr. Sung know what
9  the password is?
10   A    Yes.
11   Q    And there are employment records that
12 are saved on this computer; right?
13   A    I don't think there's anything in the
14 computer other than what we just went over.
15   Q    Okay. I'm just going to draw your
16 attention back to Plaintiff's Exhibit number 6,
17 do you have that, it's the packet with the date
18 range of March 4 to March 8, 2013; are you
19 looking at that?
20       THE INTERPRETER: April 3, you said.
21   Q    I said March 4, if you can turn to
22 the second page, so this example of the payment
23 report, where are these payment reports kept?
24   A    This particular one?
25   Q    Not that particular one, but just the

112

M. KIM

1
2  payment reports in general?
3      A   This is in the store.
4      Q   In the office?
5      A   Yes.
6      Q   In one of the cabinets?
7      A   It's actually outside on the shelf.
8      MS. BARBOSA:  Very good, thank you.
9      Q   You said earlier that you would be
10  responsible for showing this payment report to
11  employees at the end of the week and obtaining
12  their signature; is that correct?
13      A   Yes.
14      Q   Would you meet with employees
15  individually to give them their pay?
16      A   Yes.
17      Q   Where would you meet with them?
18      A   In the office.
19      Q   Would you just call employees in one
20  by one?
21      A   Since each employee ends their day at
22  different times, they would just come and see
23  me based on when they leave for work.
24      Q   And would this payment report always
25  be completely filled out prior to requesting

113

M. KIM

1
2  the employees to sign?
3      A   Yes.
4      Q   I believe that you testified earlier
5  that sometimes you would forget to have the
6  employees sign this payment report because for
7  whatever reason, perhaps you were too busy; is
8  that right?
9      A   Yes.
10      Q   Could you recall an occasion where
11  perhaps you would ask employees to sign more
12  than one payment report at the same time?
13      A   Yes, I had.  I want to say that if
14  there were new workers I wouldn't do that, but
15  these workers have worked with me for a very
16  many years.
17      Q   Would you ever ask employees to sign
18  five payment reports in one sitting?
19      A   Only on one occasion, although Mr.
20  Sung is not aware of this incident, I had on
21  one occasion had an employee sign a multiple
22  payment report and I think that was because I
23  needed, was shorthanded at the store and I had
24  to personally perform a lot of duties and
25  missed out, missed out on having an employee

114

M. KIM

1
2  sign each time they received wages.
3      Q   Are you thinking of one employee or
4  more than one employee?
5      A   It did apply to other employees as
6  well.
7      Q   Did it apply to the Plaintiffs,
8  Esteban Perez, Felipe Galindo and Delfino
9  Lopez?
10      A   I don't know exactly when that was,
11  but I do remember having at least one of them
12  sign multiple payment report.
13      Q   So not all three, but just one of
14  them?
15      A   All of those three, and then more,
16  other employees as well.
17      Q   So you recall these three plaintiffs
18  being required to sign multiple payment reports
19  in one occasion; is that right?
20      A   My answer is yes, but Mr. Sung is not
21  aware of it.
22      Q   Can you recall more or less when this
23  happened?
24      A   As I explained I do not know when,
25  what time period that that was.

115

M. KIM

1
2      Q   Was it two years ago, three years
3  ago?
4      A   I don't remember.
5      Q   Now, when you say that you recall
6  that employees including the three plaintiffs
7  in this case were required to sign multiple
8  payment reports in one setting, when you say
9  multiple, how many payment reports do you think
10  you're talking about, more than ten?
11      A   I do not recall that, how many.  And
12  I'm saying I did, but I don't know when that
13  was.
14      Q   I understand that you don't remember
15  when and you do not remember the exact amount
16  of payment reports that the plaintiffs and
17  other employees were required to sign, what I'm
18  asking is for you to try to remember an
19  estimate, so is it possible that the employees
20  including the three plaintiffs were required to
21  sign more than five?
22      A   As I said, it's very difficult to
23  recall, while I can clearly recollect that
24  there were incidents like that where an
25  employee had to sign multiple payment report in

116

29 (Pages 113 to 116)

M. KIM

1
2    one sitting, but again, I can't recall if there
3    were three or four or five or ten.  I really
4    cannot testify to that.
5        Q    Do you recall whether there was more
6    than one instance in which employees including
7    the three plaintiffs were required to sign
8    multiple payment reports?
9        A    In the last ten years there had to
10   have been at least two or three times, I would
11   say.
12       Q    And again, when you say that there
13   were multiple payment reports that they signed,
14   were these payment reports completed, was the
15   information filled out on the table?
16       A    Of course.
17       Q    Is there another Silo Café located in
18   New York City?
19       A    Yes, there is one more with the same
20   business name.
21       Q    Is this the Silo Café that's located
22   at 31 East 32 Street?
23       A    I believe that is correct.
24       Q    Have you ever visited this Silo Café?
25       A    I did.

117

M. KIM

1
2        Q    How many times have you visited the
3    Silo Café located at 31 East 32 Street?
4        A    Under ten times.
5        Q    Under ten times?
6        A    Yes.
7        Q    Who manages the Silo Café located at
8    31 East 32 Street?
9        A    I don't know because at that business
10   there's too many turnover of managers.
11       Q    For what purpose would you visit
12   during the ten times that you described
13   earlier?
14       A    It's normally when I need to pick up
15   something from that location, including like
16   business hat or some supplies.
17       Q    Does Mr. Sung own the Silo Café
18   located at 31 East 32 Street?
19       A    I don't know for sure.  I can only
20   guess he must be because it's the same business
21   name.
22       Q    Have you ever met with Mr. Sung at
23   the Silo Café located at 31 East 32 Street?
24       A    I have once or twice.
25       Q    Are you aware that the New York City

118

M. KIM

1
2    Department of Labor investigated the Silo Café
3    located at 31 East 32 Street?
4        A    I was told that it happened, after
5    this lawsuit began.
6        Q    Who told you?
7        A    Mr. Sung.
8        Q    On what occasion did he talk to you
9    about the Department of Labor investigation?
10       A    As I said, upon receiving the papers
11   for this lawsuit, he mentioned it.
12       Q    What did he say about it?
13       MR. VARACALLI:  Objection,
14   privileged, don't answer.
15       MS. BARBOSA:  What's privileged?  I
16   am asking him what he spoke to with
17   Andrew Sung.
18       MR. VARACALLI:  Because it's two
19   managers discussing a legal issue and for
20   purposes of privilege within the
21   corporation, since they are two
22   representatives of the company, they have
23   privilege between them when discussing
24   legal matters.  Now, when they're
25   discussing non legal matters, by all

119

M. KIM

1
2    means, but this is about the
3    investigation.
4        MS. BARBOSA:  I am not aware of any
5    privilege that would prohibit him from
6    discussing a matter with someone who is
7    not his attorney.
8        MR. VARACALLI:  Management can
9    discuss between them what their legal
10   strategy is.
11       MS. BARBOSA:  Sure.
12       MR. VARACALLI:  And they are not
13   going to waive their privilege in the
14   same way that any organization has a
15   managerial structure.  Has the ability to
16   do that.
17       MS. BARBOSA:  I am not specifically
18   asking about his strategy, I am just
19   asking what they discussed about the DOE
20   investigation.  I'm confused as to how
21   that is privileged and confidential.
22       MR. VARACALLI:  If you have a
23   particular question that's non legal in
24   nature, then I suggest that you answer
25   it, but as the company attorney, I don't

120

30 (Pages 117 to 120)

M. KIM

1  know what his response will be.
2    MS. BARBOSA:  Why don't we see what
3  his response is?
4    MR. VARACALLI:  If you have a
5  particular question about the
6  conversation, I suggest you ask it, but
7  if it's phrased like that, I will have to
8  object for privilege.
9    MS. BARBOSA:  Why don't you just
10  instruct him not to answer any questions
11  involving legal strategy, why don't you
12  just object to that, but I am asking a
13  general question about what two people
14  who worked for a business, talked about
15  regarding an investigation.
16    MR. VARACALLI:  Okay.  Mr. Kim, Mr.
17  Kim, you're not to discuss any
18  discussions about legal strategy, any
19  discussions about the defense or merits
20  of the investigation.  Everything else
21  you can answer.
22    THE WITNESS:  But in fact there was
23  no contents of that sort.
24    Q   What did he tell you, you told me

121

M. KIM

1  that you guys were discussing the New York
2  State Department of Labor investigation, can
3  you tell me what you discussed?
4    A   In fact he had not, as I said before,
5  upon the litigation, he told me that 32 Street
6  store was under investigation of the labor
7  department.
8    Q   Did he say anything else regarding
9  the department of labor investigation?
10    A   What is there to discuss?  Because
11  it's already been done that they were
12  investigated.  In fact, Mr. Sung said that this
13  is not to be my concern, because this is going
14  to be potential headache and not to concern
15  myself with that investigation.
16    Q   So the only thing he told you related
17  to the department of labor investigation is
18  that there was an investigation and you
19  shouldn't worry yourself about it; is that what
20  you're saying?
21    A   That is correct.  Because there's
22  nothing I can do, in fact, about that.
23    Q   Did he instruct or encourage you to
24  make any changes in your practices at 50 Food

122

M. KIM

1  Corp due to the department of labor
2  investigation at 31 East 32 Street?
3    A   How should I explain this?
4    Q   You can take a few seconds to think
5  about it?
6    A   It's hard to read what he intended
7  because he's really not a very talkative
8  person.  So looking back in retrospect, I think
9  that -- so because of that investigation, that
10  was probably the reason why he emphasized on
11  paperwork keeping and maintaining good records
12  and paperwork.
13    Q   Do you recall when this conversation
14  was with Mr. Sung regarding the DOL
15  investigation and what instructions or
16  recommendations he made for you because of this
17  investigation?
18    A   Actually he is so not talkative, even
19  when he goes to Korea he doesn't even check
20  anything, other than just to call once and then
21  just find out how things are going.
22    Q   Thank you, but that doesn't answer my
23  question.
24    My question is, can you recall more

123

M. KIM

1  or less when you had this conversation with Mr.
2  Sung about the DOL investigation?
3    A   Must have been about three to four
4  years ago, I am not really certain.
5    Q   And you just testified that Mr. Sung
6  encouraged you to be very vigilant about the
7  paperwork in light of the DOL investigation; is
8  that right?
9    A   Yeah, this is my view now, after
10  having learned about the investigation of the
11  other store because he had not made any mention
12  about that on prior occasions.
13    Q   I don't understand.  Did he speak
14  with you about the department of labor
15  investigation and give you recommendations or
16  not?
17    A   Regarding the 32 Street store
18  situation, I heard about that investigation by
19  labor department, either October, October last
20  year, which is really the same date I received
21  this notification for litigation.  And then Mr.
22  Sung at the time told me about that
23  investigation at the 32 Street store so now
24  looking back, I'm connecting that that was the

124

M. KIM

1   M. KIM
2   reason why Mr. Sung told me about maintaining
3   the documents more vigilantly.
4       Q   Was it in that same conversation that
5   he told you about the DOL investigation that he
6   told you to be very careful about keeping
7   paperwork?
8       A   You mean referring back three or four
9   years ago or right now?
10      Q   So are you telling me that you had
11  two conversations with Mr. Sung about the DOL
12  investigation?
13      A   Yeah.  Okay, he only mentioned, only
14  once regarding 32 Street store being
15  investigated by the labor department, when I --
16  when we receive this lawsuit notification.
17      Q   Great.  Okay.  So in that
18  conversation in October of 2017, when he spoke
19  to you about the department of labor
20  investigation, besides telling you, my store at
21  31 East 32 Street is being investigated, what
22  else did he tell you regarding the
23  investigation, that's all I want to know?
24      A   Just that he will take care of it,
25  like I said that I should not be concerned

125

1   M. KIM
2   about it.
3       Q   Did he say in that conversation, hey,
4   you should be very careful about paperwork at
5   Silo Café at 805 Third Avenue?
6       A   Yes, he mentioned it.  And I believe
7   he meant moving forward, because there's
8   nothing I can do to change anything that was in
9   the past.
10      Q   Got it.  Got it.  Okay.  Besides
11  being vigilant about keeping paperwork, did you
12  implement any type of new policy or did you
13  change anything in the way you do your work
14  because of what you heard about the department
15  of labor investigation?
16      A   Nothing more significant other than
17  being thorough and vigilant about keeping the
18  documents, business documents regarding
19  employees and other relevant documents for
20  business.
21      Q   Who hired Esteban Perez?
22      A   I did.
23      Q   Did you run the decision regarding
24  his hire by anyone?  Did you get authorization
25  from someone to hire Mr. Perez?

126

1   M. KIM
2       A   No, I just made that decision to hire
3   him by myself.
4       Q   Were you filling a position that was
5   vacant?
6       A   Yes, I was finding, looking for a
7   replacement for a vacancy.
8       Q   What was he hired to do, Mr. Perez?
9       A   He was working the cold cut area
10  making sandwiches.
11      Q   And do you recall more or less what
12  year he was hired?
13      A   It's very hard to recall exactly.
14      Q   Has his schedule always remained the
15  same?
16      A   Always, yes.
17      Q   What about that change in January of
18  2015 that you described to me?
19          THE INTERPRETER:  January 2015, you
20  said?
21          MS. BARBOSA:  Yes.
22      A   I believe starting 2015 we change to
23  eight hours a day.
24      Q   And that change applied to Mr. Perez?
25      A   Everyone, not just him.

127

1   M. KIM
2       Q   So prior to January 2015, Mr. Perez
3   worked five days a weeks, nine and a half hours
4   per day?
5       A   Yes.
6       Q   And then after January 2015 he
7   typically only worked forty hours a week?
8       A   Yes.
9       Q   Do you recall what Mr. Perez, what
10  his first -- what his hourly rate was when he
11  was hired?
12      A   Something like maybe $7.00 or up to
13  $8.00, something.
14      Q   Would the information in the payment
15  report that we reviewed earlier be the most
16  accurate reflection of what Mr. Perez was
17  earning on a weekly basis?
18          THE INTERPRETER:  You're talking
19  about expenditure?
20          MS. BARBOSA:  No.
21          THE INTERPRETER:  Which one?
22          MS. BARBOSA:  The payment report.
23          THE WITNESS:  This one (Indicating)?
24          MS. BARBOSA:  Yes, you're pointing
25  to the payment report, the document.

128

32  (Pages 125 to 128)

M. KIM

1
2    THE WITNESS: Yes.
3        THE INTERPRETER: So the question
4    is, Is this reflecting?
5    Q    Would those documents, the payment
6    reports, you understand what the payment report
7    is; right? Would the payment report be the
8    most accurate reflection of what Mr. Perez was
9    earning on a weekly basis?
10    A    Yes.
11    Q    What was Mr. Perez's role at Silo
12    Café?
13    A    So he would be responsible for making
14    cold cut sandwiches and also help out in case
15    someone working at hot sandwich was --
16        MS. BARBOSA: Do you want to take a
17    second?
18        THE INTERPRETER: I'm sorry, I will
19    get some water.
20        (Whereupon, a short recess was
21    taken, time noted:  3:37-3:38 PM.)
22        THE INTERPRETER: I meant to say not
23    available or absent.
24    Q    Who assigned Mr. Perez his tasks?
25    A    I did.

129

M. KIM

1
2    to other employees and I would normally engage
3    in filling the task that Mr. Perez was supposed
4    to perform that day.
5    Q    Who hired Delfino Lopez?
6    A    Delfino and Felix had already been
7    hired working at the store prior to my
8    beginning, prior to my starting to work at the
9    store.
10    Q    Do you know who hired Felipe?
11    A    I don't know.
12    Q    What was Mr. Lopez's position at Silo
13    Café?
14    A    Yeah, he worked like a prep cook in
15    the morning. For lunch he worked in the cold
16    cut section.
17    Q    Would it be correct to say that
18    similar to Mr. Perez, prior to January 2015 he
19    worked five days a week, nine and a half hours
20    per day?
21    A    Yes.
22    Q    And after January 2015 he worked five
23    days a week, eight hours a day?
24    A    Yes.
25    Q    Do you recall what Mr. Lopez's salary

131

M. KIM

1
2    Q    Was there any other person who would
3    give him instructions of what to do at the
4    café?
5    A    No.
6    Q    If Mr. Sung was present at the café,
7    would he have the authority to give
8    instructions to Mr. Perez?
9    A    Yes.
10    Q    Do you recall Mr. Perez ever missing
11    a day of work?
12    A    Yes.
13    Q    Would Mr. Perez call in?
14    A    I believe he did.
15    Q    Who would he speak to when he called
16    in?
17    A    Myself.
18    Q    When Mr. Perez would call in to say
19    that he would be missing work, did you have to
20    communicate this to anyone?
21        THE INTERPRETER: I'm sorry. If he
22    was to call --
23    Q    Would you need to communicate that
24    Mr. Perez was missing a day of work to anyone?
25    A    Of course I would relay the message

130

M. KIM

1
2    was when you first started at Silo Café?.
3    A    I do not recall.
4    Q    Do you recall whether during your
5    time at Silo Café Mr. Lopez received any
6    raises?
7    A    Yes, he had received the increase,
8    salary increase.
9    Q    Who made those decisions regarding
10    the wage increases?
11    A    As I normally do, I would make that
12    suggestion to the owner, Mr. Sung, and it's Mr.
13    Sung's final decision.
14    Q    Okay. Got it. Thank you.
15        Besides yourself, is there anyone
16    else at Silo Café who had the authority to give
17    instructions to Mr. Lopez?
18    A    When he was temporarily working in
19    the kitchen, it's possible for the chef to give
20    work instructions.
21    Q    Who was the chef?
22    A    Mr. Whang.
23    Q    Mr. Whang, W O N G?
24        THE INTERPRETER: W H A N G.
25    A    W H A N G.

132

33  (Pages 129 to 132)

M. KIM

```
1
2      Q    What is Mr. Whang's first name?
3      A    W O N M O.
4      Q    Would Mr. Sung have the authority to
5  give Mr. Lopez instructions?
6      A    Yes.
7      Q    Do you recall Mr. Lopez missing a day
8  of work?
9      A    Yes, he did.
10     Q    Like Mr. Perez, would he call in and
11 speak with you directly?
12     A    Yes.
13     Q    Mr. Whang, who is the chef, does he
14 still work at Silo Café?
15     A    Yes.
16     Q    Do you recall when he was hired?
17     A    He was hired before I was.
18     Q    So he was probably hired when the
19 café was opened?
20     A    Very probably.
21     Q    I believe you indicated earlier that
22 Mr. Galindo was already working at the café,
23 Felipe Galindo was already working at the café
24 when you started; is that right?
25     A    Yes.
```

133

M. KIM

```
1
2      Q    And Mr. Galindo continues to work at
3  Silo Café; right?
4      A    Yes.
5      Q    What is his position?
6      A    He is grill man.
7      Q    Has that always been his position
8  since you started at Silo Café?
9      A    Yes.
10     Q    And same as Mr. Perez and Mr. Lopez,
11 would it be correct to say that prior to
12 January 2015 he worked typically five days a
13 week, nine and a half hours per day?
14     A    Yes.
15     Q    After January of 2015 he worked five
16 days a week, eight hours a day?
17     A    Yes.
18     Q    And again, would the wage payment
19 reports be the document that accurately
20 reflects the amount of wages that Mr. Galindo
21 received on a weekly basis?
22     A    Yes.
23     Q    Besides yourself, would it be safe to
24 say that Mr. Sung had the authority to give
25 instructions to Mr. Galindo during his
```

134

M. KIM

```
1
2  employment at Silo Café?
3      A    Yes.
4      Q    And similar to Mr. Perez and Mr.
5  Lopez, do you recall Mr. Galindo ever missing a
6  day of work?
7           THE INTERPRETER:  You are talking
8      about Galindo; right?
9           MS. BARBOSA:  Yes.
10     A    Actually a lot.
11     Q    And would he also call in to speak
12 with you if he needed to miss a day of work?
13     A    Yes.
14     Q    You mentioned that Mr. Galindo called
15 in a lot; is that right?
16     A    That is the case and another issue I
17 may want to point out about him is that he's
18 habitual late to work.
19     Q    Have you ever spoke to anyone about
20 these problems with Mr. Galindo?
21     A    Of course I did.
22     Q    Did you speak to Mr. Sung about these
23 problems with Mr. Galindo?
24     A    About once or twice I spoke to Mr.
25 Sung about that.
```

135

M. KIM

```
1
2      Q    What did you speak to Mr. Sung about?
3      A    Well, we did discuss about him being
4  excessively late, but we concluded that even
5  though he's excessively late, he is very
6  capable in other areas of his work, that's why
7  we just decided to dismiss that issue.  And we
8  really did need his work because we had
9  frequent turnover for grill man's job.
10     Q    Did you ever consider disciplining
11 Mr. Galindo?
12     A    I have to say no, because if we did,
13 do you think it's possible that he could still
14 be working there.  I actually would like to
15 express one incident.
16     Q    Why don't we wait until we get
17 through these questions.  Time is running out
18 and I have several more pages of questions to
19 ask you.
20          Did you ever ask for advice from Mr.
21 Sung about what to do about Mr. Galindo?
22     A    I want to tell you that I did mention
23 to Mr. Sung what I'm unhappy about with respect
24 to Mr. Galindo, so I issued the complaint,
25 addressed the complaint to the Mr. Sung, but no
```

136

34  (Pages 133 to 136)

M. KIM

1  actions or no discipline was taken to Galindo,
2  that's why he's still working.
3  Q   Was it Mr. Sung's decision not to
4  discipline Mr. Galindo?
5  A   Actually Mr. Sung is very aggressive
6  and outspoken when it comes to making
7  disciplinary decisions and it was actually I
8  who decided to keep Galindo because we have
9  worked together for a very long time and didn't
10  want to cause any disadvantage for him.
11  MS. BARBOSA:  Okay, thank you.
12  So I don't think I have any other
13  questions in response to the 30(b)(6)
14  deposition.  So I'm going to just turn
15  over and begin asking you questions in
16  your individual capacity; okay?
17  THE WITNESS:  I do want to say that
18  I have worked with Felix over ten years
19  working like a family, but I do
20  understand that Felix accuses me of
21  things that are not true.  He thinks that
22  I am against him or trying to get rid of
23  him, but if that was true, I could have
24  found many ways to get rid of him, but I

137

M. KIM

1  didn't.  There was an incident where
2  Felix got into an argument or fight with
3  a coworker at which time he took out a
4  knife, he held a knife in front of
5  customers and Mr. Sung said to call the
6  police, but I really didn't know how to
7  deal with it, and didn't want to put him
8  into trouble, so I managed to reconcile
9  the situation, and I tried to help him
10  keep his job.  So I'm trying to explain to
11  you that his accusation about me not
12  wanting him is totally false, and I could
13  have just used his lateness alone to get
14  rid of him because I could have warned
15  him many times and then if he's still
16  late, which he was, I could have just
17  used that grounds to fire him which I
18  didn't.
19  MS. BARBOSA:  Okay.  Thank you.  I
20  have some questions I want to ask you
21  now.
22  (Whereupon, the Examination Before
23  Trial of this witness was concluded at
24  3:54 P.M.)

138

ACKNOWLEDGEMENT

STATE OF NEW YORK )
                        SS:
COUNTY OF        )

I, MINCHUL KIM, hereby certify that I have
read the transcript of my testimony taken under
oath in my deposition of May 22, 2018;  that
the transcript is a true, complete and correct
record of what was asked, answered and said
during this deposition, and that the answers on
the record as given by me are true and correct.


_____
MINCHUL KIM


Subscribed and sworn to
before me this _____ day
of _____, 2018.


_____
NOTARY PUBLIC

139

INDEX

| WITNESS | BY | PAGE |
|---|---|---|
| MINCHUL KIM | Ms. Barbosa | 4 |

EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice | 20 |
| 2 | Plaintiff's First Request For Production of Documents and Interrogatories | 27 |
| 3 | Defendant's Responses to Plaintiff's Request For Production of Documents | 33 |
| 4 | Staff expenditure | 58 |
| 5 | Payment Report | 70 |
| 6 | Staff expenditure | 81 |
| 7 | Staff expenditure | 90 |

140

35  (Pages 137 to 140)

```
 1
 2              C E R T I F I C A T E
 3
 4       I, KATHLEEN ANDERSON, a Notary Public of
 5   the State of New York, do hereby certify
 6       That the testimony in the within
 7   proceeding was held before me at the aforesaid
 8   time and place
 9       That said witness was duly sworn before
10   the commencement of the testimony, and that the
11   testimony was taken stenographically by me,
12   then transcribed under my supervision, and that
13   the within transcript is a true record of the
14   testimony of said witness.
15       I further certify that I am not related to
16   any of the parties to this action by blood or
17   marriage, that I am not interested directly or
18   indirectly in the matter in controversy, nor am
19   I in the employ of any of the counsel.
20       IN WITNESS WHEREOF, I have hereunto set my
21   hand this 14th day of June, 2018.
22
23         Kathleen Anderson
           _____
24              KATHLEEN ANDERSON
25
```

141

36 (Page 141)